# CRIMINAL CASES.

## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

### SCRUGGS V. COMMONWEALTH.

### June 12, 1919.

1. HOMICIDE—*Burden of Proof—Reasonable Doubt—Suicide or Murder—Case at Bar.*—In a prosecution for homicide the burden of proof rests upon the Commonwealth to establish the guilt of the accused. beyond a reasonable doubt, either by direct or circumstantial evidence. In the instant case where the opposing theories were, first, that the accused murdered his wife, and second, that she died by her own hand, the evidence in respect to the relations existing between the husband and wife did not justify the imputation that he would have taken her life, or even do her bodily harm, and considering the whole evidence as upon a demurrer thereto, the suicide theory was not disproved by the Commonwealth, and until that was done it could not be predicated of the evidence that it established the guilt of the accused beyond a reasonable doubt. On the contrary, the evidence, including the family history of the deceased, strongly supported the hypothesis that she died by her own hand, and the evidence that she. was murdered by accused was far less cogent.

2. HOMICIDE—*Hearsay Evidence.*—In a prosecution for homicide the trial court admitted evidence of an alleged conversation of the deceased with a witness, but not in the presence of the accused, "that he owed her some money and had to pay it back to her."
   *Held:* That the conversation was plainly inadmissible under the hearsay rule.

3. HEARSAY EVIDENCE—*Motive.*—Motive can no more be proved by hearsay evidence than any other fact.

Error to a judgment of the Circuit Court of Campbell county.

*Reversed.*

The opinion states the case.

W. M. *Murrell, Duncan Drysdale* and *L. Bradford Waters,* for the plaintiff in error.

*Jno. R. Saunders, Attorney General; J. D. Hank, Jr., Assistant Attorney General; A. H. Light* and *F. Briggs Richardson,* for the Commonwealth.

WHITTLE, P., delivered the opinion of the court.

Plaintiff in error, Thomas S. Scruggs, was indicted in the Circuit Court of Campbell county for the murder of his wife, Hattie N. T. Scruggs, and upon his trial was found guilty of murder in the second degree and sentenced to confinement in the penitentiary for ten years.

Two assignments of error are relied on to reverse the judgment:

1. To the refusal of the court to set aside the verdict because of the insufficiency of the evidence to sustain it; and,

2. To the action of the court in admitting certain evidence over the objection of the accused.

The material evidence may be stated as follows: At the time of the tragic death of the wife, on the night of June 2, 1917, she and the accused had been married about seven years. During the last five years of their married life they had resided in the town of Altavista, in Campbell county. The accused was appointed the policeman of the town, and held the office for about four years, when he resigned, in April, 1917. In addition to his duties as policeman, he and his wife kept a hotel known as the "Altavista Hotel," and by their joint efforts from that source had accumulated property worth $2,000. The wife, though not in good health, took an active part in the hotel business and contributed to its success. Much of the evidence is addressed

93

to the subject of the relations existing between the parties. In the main, they were friendly and cordial, but the wife had reached the age when what is known as "change of life" occurs with females, and was specially liable to morbid and hysterical influences. She occasionally became nervous and irritable towards her husband, and their intercourse at such times would be strained and disagreeable, yet never to the extent of justifying the belief among their acquaintances that he would inflict upon her bodily harm. Curious as it may seem, one of the chief causes of discord between them seems to have arisen from her affection for her husband and solicitude for his safety. Against her remonstrance, he would now and then accompany United States revenue officers and State prohibition officers on raids upon "moonshine" stills in the vicinity, which, on account of the danger attending such expeditions, would bring on spells of despondency with his wife and cause her great anxiety—a condition which was accentuated by the fact that a brother of the accused had been murdered by unknown persons supposed to have been engaged in illicit distilling, and he had received an anonymous communication threatening him with a similar fate.

On the morning of June 2, 1917, the accused went on one of these raids with a prohibition officer across the river into Pittsylvania county, in the Reed creek neighborhood. To allay the fears of his wife, he told her he was going over to Reed creek fishing. He did not return until after dinner, and she met him at the front door of the hotel, and was in an anxious, nervous state on account of his not returning earlier. He put his arm around her and they walked back to the kitchen, where she gave him his dinner. On their way, they both stopped at the sideboard, and accused took the key to the sideboard from a vase, where it was kept, and unlocked the drawer, placing his pistol therein; he then locked the drawer, replaced the key in the vase, and

they proceeded to the kitchen. That was on Saturday, and accused testified that he was quite busy the rest of the afternoon going from place to place in the town buying supplies for the use of the hotel for the following day and Monday. He went in and out of the house several times during the afternoon, but had no occasion to get the pistol, and did not take it out of the drawer, or have it, or any other pistol in his hands or about his person after he put the pistol in the sideboard drawer. After supper the accused and his wife, and Dewey Scruggs, a daughter by a former marriage, who was about fourteen years of age (the three composing the family) were at the front of the hotel, part of the time engaged in conversation with two friends, one of them the policeman who had succeeded the accused when he resigned that office. A cloud coming up, these parties went across the street to a drug store. Thereupon, accused, his wife and daughter, after putting out the lights below, went upstairs to their bedrooms about 9:30 o'clock. The bedroom of the accused and his wife was at the extreme end of the hall; and that of his daughter adjoined—the doors to the two rooms being less than one foot apart, each with a transom over the door, which was open. Accused retired first, occupying the side of the bed next to the door, as he frequently had occasion to get up in the night to receive guests who came to spend the night at the hotel. After he had laid down on the bed, his little daughter came in, as was her habit, and kissed her father and stepmother good-night and went back to her own room. His wife soon came to bed; and they talked about three-quarters of an hour, when he went to sleep. His wife was talking about her health, and said she was afraid she was getting in the same condition she had been in some time before. Accused told her that she ought to go to a hospital, and urged her to go the next day; but she expressed an unwillingness to do so, and remarked that she would rather die than go to

a hospital. He told her she ought not to talk that way. Accused further testified that he was suddenly awakened by a very loud noise, which appeared to be close to his ear. He jumped out of bed at once and snapped on the electric light, which was near at hand. His first impression was that some one had fired a shot through the window which was near the bed, but as he turned to look at his wife, he discovered blood flowing from a wound in her neck just below the left ear. He was terror-stricken, and rushed out into the hall, calling to a Mr. Myers, a boarder, who roomed two doors away on the same hall, and cried out to him to go for the doctor at once. On his return he met his daughter coming out of the room crying and very much distressed. He slipped on his pants, as people were beginning to assemble. Witness also stated that he did not see the pistol on the bed. The daughter, however, testified that she saw the pistol lying in deceased's lap, about half-way between her knees and the lower part of her abdomen, not far from her left hand, with the muzzle pointing towards the wall. She took the pistol and laid it on the floor near the wall, or side of the room next to where deceased's body was lying on the bed.

The doctor was summoned about twelve o'clock, and went to the hotel in an automobile; he was suffering from a sprained ankle, which delayed him some fifteen or twenty minutes. When he went into the room, the body of deceased was lying on the bed, and the accused was kneeling by the side of the bed with his shirt and pants on. Accused asked witness if he could do anything for his wife, and he replied that he could not, as she was already dead. Witness then heard some one fall on the floor, and looking around saw the accused stretched out on the floor in an unconscious condition; and he then turned his attention to him, and he was carried into an adjoining room and placed on a bed. When witness first noticed the body of deceased,

her right hand was extended over the side of the bed and her left hand was down by her side; her head was somewhat elevated, and she was lying on her back with her face turned toward the right side; that there was a wound about one inch or more below the lobe of the left ear, from which blood was flowing; that she was lying on the side of the bed farthest from the door, or on the back side of the bed, with her face turned somewhat to the right; that the bed was about twelve inches from the wall; that he took hold of her left hand to ascertain whether she had any pulse, and she had none; that he found no other wound about her head or face, except the pistol-shot wound. He probed for the ball, but did not find it at that time. At the request of her brother, he held an autopsy on the body some forty days after she had been buried, and found the ball on the right side of the head. It had ranged upward from the left side to the right side of the head and lodged under the skull above the right ear. Deceased was right-handed, but the witness stated that she "could have shot herself without any difficulty if the pistol was fired with the thumb of the left hand, or if the pistol was held with both hands; that it would have been more difficult for her to have shot herself with her left hand, but he did not think it would have been impossible;" that there were powder-stains and burns on the inside of the wound, but none on the outside—"the powder-stains and burns on the inside of the wound indicated that the pistol had been pressed against the neck of the deceased;" that shock would have caused instant death; he did not think there would have been necessarily much change in the position of the body from the shock; there might have been one movement, but generally there would have been a relaxation of the muscles. The coroner held an inquest that night over the dead body of Mrs. Scruggs, and at the request of some of her relatives a second inquest was held the follow-

ing Monday; and the verdict of the jury on both occasions was that she came to her death by suicide.

There were three trials of the case. The first resulted in a hung jury; on the second trial, the jury found the accused guilty of murder in the second degree and fixed his punishment at eight years' confinement in the penitentiary. That verdict, on the motion of the accused, was set aside by the trial court as contrary to the law and the evidence. The second verdict and judgment sustaining it are now before us for review.

[1] The opposing theories of the case are: (1) On behalf of the Commonwealth, that the accused murdered his wife; and (2) on behalf of the accused, that she died by her own hand.

Fairly considered, we are of opinion that there is nothing in the evidence in respect to the relations existing between the husband and wife to justify the imputation that he would have taken her life, or even done her bodily harm. The statement of Dr. Smith, the family physician, who was introduced by the Commonwealth, and whose testimony vouches for his intelligence and fairness, states that he had heard some unpleasant talk between them that was embarrassing to him, but that he had never heard anything in the nature of a threat by the accused against his wife, nor had he ever seen anything that made him think accused would use violence towards her. Furthermore, to show motive, the Commonwealth proved that Mrs. Scruggs had on deposit in bank $900, of which she permitted the accused to withdraw $140, which was passed to his checking account. But it was proved by the cashier, a witness for the Commonwealth, that she had never made any complaint of the transaction, and the incident was fully explained by the accused. He testified that he had been offered some nicely cured meat—hams, sides, etc.—a good deal cheaper by taking the whole lot; and not having money enough to

pay for it, he borrowed $140 from his wife, and made the purchase for the hotel.

The burden of proof rested upon the Commonwealth to establish the guilt of the accused beyond a reasonable doubt, either by direct or circumstantial evidence; and, from a painstaking examination of all the evidence (considered as upon a demurrer thereto), it is impossible to escape the conclusion that it has failed to meet that burden. We have not overlooked alleged discrepancies and attempted impeachment of the evidence of the accused, of which the record furnishes several instances. Thus, two witnesses were introduced to contradict the statement of the accused that he had no pistol in his possession on the day of the tragedy after he replaced his pistol in the sideboard drawer. These men testified that they were in Altavista that day on business, and in the afternoon saw the accused walking along the street with a pistol in his hand. Both of these parties were personal enemies of the accused—one of them in connection with the capture of an illicit still, and two of the brothers of the other witness had been prosecuted by the accused, charged with the murder of his brother. If it were a fact that the accused was walking the streets of the town with a pistol in his hand on the occasion referred to, it may be assumed that it could have been shown by disinterested witnesses. We do not regard the other occurrences of sufficient moment to demand special notice. The suicide theory has not been disproved by the Commonwealth, and until that is done it cannot be predicated of the evidence that it establishes the guilt of the accused beyond a reasonable doubt. On the contrary, the evidence, including the family history of the deceased, strongly supports the hypothesis that she died by her own hand. A servant in the family, after testifying to the nervous condition of the deceased and to her having "fainting spells," or "dying spells," as she called them, says, on one occasion after she

had read the threatening letter to her husband (hereinbefore alluded to), she was weeping and in great distress, and "wringing her hands," declared that "some one would kill 'Dearest,' the name that she generally called Mr. Scruggs by." Witness testified that deceased went up-stairs, and "pretty soon witness followed her," and when she went into her room found her lying on her back on the bed with a pistol in her hand, the muzzle of which she held against her breast. Witness asked her "what in the name of God she was doing," and jumped upon the bed and took the pistol away from her, and told her she was going to tell her husband as soon as he got back. Thereupon, Mrs. Scruggs begged her not to tell him, and offered to reward her if she would not mention the occurrence. That there was a strong hereditary tendency to insanity in her family is clearly proved. Her father's mind gave away in his old age, and her mother committed suicide by hanging herself; and, like the daughter, her bad health was accompanied by fainting or "dying" spells. Moreover, a brother of deceased died in an insane asylum. These facts testified to both by witnesses for the Commonwealth and the accused, in addition to the circumstances attending the death of the wife, strongly support the theory that she took her own life. The evidence that she was murdered by her husband is far less cogent.

The contention that the pistol was found in a position in which it could not have been if the wound had been self-inflicted is not convincing. It assumes that Mrs. Scruggs was lying on her back on the bed when the shot was fired. If that be correct, one of two causes might have placed the pistol where it was discovered—first, the convulsive movement of the muscles after the fatal shot was fired, of which the doctor testified; and, second, that the pistol might have been thrown in that position by the sudden disarrangement of the bed clothing when the accused sprang out of bed on

being awakened by the explosion. However that may have been, it is, at least, reasonable to assume that if the husband had been the guilty agent, the setting of the scene of the tragedy would have been in harmony with, rather than opposed to, the theory of suicide. But the physical facts surrounding the death are equally consistent with the supposition that Mrs. Scruggs was in a sitting posture when the fatal shot was fired, in which event the pistol would naturally have fallen from her relaxed grasp into her lap, while her lifeless body would have sunk back to the position in which it was found.

There are two other circumstances that point to suicide rather than to murder. The range of the bullet was natural if the wound was self-inflicted, but was unnatural if the pistol was fired by another's hand. In the latter case, the bullet would most likely have entered the head at a right angle instead of diagonally. And again, the muzzle of the pistol would not have been pressed against the neck or head of the victim by one intending murder, lest the contact should awaken her and cause her to make outcry.

Finally, upon the first assignment, there is no suggestion of motive for the crime, except perhaps that furnished by the incident of the husband borrowing from the wife $140, which was used in their joint business of keeping the hotel. The naturalness and insignificance of that transaction would seem to accentuate the absence, rather than to show the presence, of motive.

[2, 3]   2. The second assignment of error is to the action of the court in admitting evidence of an alleged conversation of the deceased with a witness (but not in the presence of the accused) "that he owed her some money and had to pay it back to her; and that when she was down in the country on a visit Mr. Scruggs wrote her that some one had broken in the house and stolen his money."

This alleged conversation was plainly inadmissible un-

94,

der the hearsay rule. *Mullins* v. *Commonwealth,* 113 Va. 787, 75 S. E. 193. It was insisted that the evidence was admissible to prove motive; but motive can no more be proved by hearsay evidence than any other fact. The case of *Parsons* v. *Harper,* 16 Gratt. (57 Va.) 64, and subsequent cases (cited by the Attorney General to sustain the admissibility of the evidence) involved the *weight,* not the *admissibility* of evidence.

Our conclusion upon the whole case is that both assignments of error are well taken, and that the judgment must be reversed, the verdict set aside, and the case remanded for a new trial to be had therein, should the prosecution deem a new trial advisable.

*Reversed.*