# Richmond

## WILLIE JACK BELTON v. COMMONWEALTH OF VIRGINIA.

June 16, 1958.

Record No. 4781.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Whittle and Snead, JJ.

The opinion states the case.

*Robert C. Smith* and *Henry Breckinridge Vance*, for the plaintiff in error.

*Thomas M. Miller, Assistant Attorney General (A. S. Harrison, Jr., Attorney General,* on brief), for the Commonwealth.

Hudgins, C. J., delivered the opinion of the court.

Willie Jack Belton, the accused, shot and killed his wife, Bessie Belton, for which a judgment was entered against him pursuant to the verdict of the jury finding him guilty of murder in the second degree and fixing his punishment at 12 years in the penitentiary.

The accused, by this writ of error, seeks to have the judgment reversed on the grounds that: (1) improper testimony was admitted over his objection; (2) the court erred in refusing to give instructions offered by him on the law of manslaughter, malice, passion and the burden of proof, and (3) the argument of the Commonwealth's Attorney to the jury was improper.

At about 8:30 p.m., April 27, 1956, the accused a 25 year old negro in the United States Air Force, walked into the police station at Winston-Salem, North Carolina and stated that "I've killed my wife," and that "it happened up in Lexington, Virginia." The officer to whom these statements were made, testified that the accused also stated that he arrived in Lexington that morning to see his wife, having left Columbus, Ohio the previous day; that he rented a car in Lexington, picked up his wife, who worked at a fraternity house, and drove a few miles out of town to a wooded area where he and his wife picked some flowers and did some target shooting with a twenty-two caliber pistol he had; that later they began arguing about her failure to send him money out of allotments she was receiving; that he took the pistol out of his pocket and shot her in the back of the head and that when she fell he shot once or twice more but did not know whether either of these shots hit her. Without determining whether his wife was dead or alive, he said that he drove to Winston-Salem, where his father lived, and that his father advised him to report the shooting to the police. The Winston-Salem officer further testified that when these statements were made to him the accused was calm, and did not appear to be drinking.

In a telephone conversation with the sheriff of Rockbridge county, the call having been made by the Winston-Salem officer, the accused told the sheriff where the shooting occurred, at which place the sheriff found the deceased lying face down with three bullet wounds in the back of her head. An autopsy disclosed that three

bullets entered in a "horizontal manner" the back of deceased's head, two of which were found in the right side of the brain and the third in the "subcutaneous tissues" of the "left posterior back of the head." No powder burns were on the body.

On July 22, 1956, pursuant to an order of the court, the accused was admitted for observation as to his mental condition to Central State Hospital, Petersburg, Virginia, where he was kept under observation until September 13, 1956. Dr. Margaret Hatfield, Chief of Criminal Service at the hospital testified that the accused was "functioning at what we call a dull normal level of intelligence," that he had the capacity to distinguish between right and wrong and that he was "mentally and emotionally capable of assisting in his own defense."

■ The accused's first contention is that the court erred in refusing to strike the testimony of Landon Wanzer on the grounds that his testimony for the Commonwealth was elicited by leading questions, was "vague and indefinite as to time, identification of person, place and relation to offense for which the defendant was charged, and such testimony constituted prejudicial error to the defendant."

While some of the questions propounded by the assistant prosecutor were leading and therefore improper, it does not appear that the accused was prejudiced thereby. Furthermore, the substance of the testimony of this witness was that he had seen the accused strike his wife and had heard him say he was "going to kill her," but he was unable to state with any degree of certainty when either event occurred. This testimony was clearly admissible.

The only other testimony to which the accused objected was that of Deputy Sheriff Charles Zolman, who testified that in February, 1956, the deceased complained to him that someone was trying to break into her apartment at night; that on one occasion she had been awakened and found the accused standing over her bed; that she was afraid of the accused and had reported to the town authorities that he was going around town armed with a gun. This testimony as to what the deceased told the officer two months before the shooting was hearsay and inadmissible. *Mullins* v. *Commonwealth*, 113 Va. 787, 75 S. E. 193; *Boatright* v. *Commonwealth*, 198 Va. 753, 96 S. E. 2d 772.

■ The accused defended the action on the ground that he killed his wife in the heat of passion and upon reasonable provocation. In support of this contention he testified as follows: On two occasions

since his marriage in 1952, he arrived home on leave late at night and found his wife drinking whiskey with a strange man, and each time she was dressed in her nightgown. He said that he had difficulty in having sexual relations with his wife, and that she would laugh at him and tell him that if he "couldn't do it, somebody else could." He admitted, however, that on the morning of April 27, 1956, he had sexual relations with a woman other than his wife.

He also testified that when he and his wife parked in the secluded wooded area they began drinking whiskey from a bottle he had purchased; that later they began to argue about the allotments she was receiving from his as a member of the armed forces and her conduct with other men. As to what subsequently occurred, he said:

"I asked her about Lonza. So she said, 'If you think I'm going with Lonza, you ask him. If you beat him—I hope he beat hell out of you.' Like I told you before, I didn't want any trouble, because I love my wife, and I didn't want no kind of trouble. I wanted to stay in Service 20 years—like I told you before. So she told me, said, 'That's right— this is my body and I give it to my—who I want to, and this is your money, and I spend it on who I want to.' She hit me—I can't remember exactly how it was. So I think she got out of the car—I think she got out of the car, and I think she was going to get some flowers—somebody was—then I called her and next thing I saw her on the ground, and then when I saw her on the ground after I come to myself in some kind of way, I called her, and when I called her she wouldn't say anything. * * * I remember one shot and I saw her on the ground—and I saw her on the ground, wounded, and I called and she wouldn't say anything, and so I mean I can't remember too well now. Next thing I know, I think I was going back up Newtown road. * * *"

The decisive question is not whether the evidence supports the verdict of the jury, but whether under all the facts and circumstances the jury was properly instructed on the pertinent principles of law and, therefore, whether the accused has had a fair and impartial trial.

The accused contends that the court committed reversible error in granting, over his objection, Instruction No. 1, which told the jury they must find the accused guilty of first or second degree murder or not guilty, and refusing to give his Instruction No. 5, which reads as follows:

"The Court instructs the jury that even though they may believe from the evidence in the case, that the defendant killed his wife,

Bessie Belton, yet if the Jury further believe from the evidence, that the killing was not from malice, but was done in the heat of passion, upon reasonable provocation, then they would not find the defendant, Willie Jack Belton, guilty of any higher offense than voluntary manslaughter, which may be punishable, in the discretion of the Jury, by confinement in the penitentiary for not less than one, nor more than five years."

The jury is not required to accept, *in toto*, either the theory of the Commonwealth or that of an accused. They have the right to reject that part of the evidence believed by them to be untrue and to accept that found by them to be true. In so doing, they have broad discretion in applying the law to the facts and in fixing the degree of guilt, if any, of a person charged with a crime. *Blankenship* v. *Commonwealth*, 193 Va. 587, 70 S. E. 2d 335; *Zirkle* v. *Commonwealth*, 189 Va. 862, 55 S. E. 2d 24.

As stated, the accused's only defense was that he killed his wife in the heat of passion, aroused by her striking him and saying she would give his money and her body to whom she pleased. There is evidence in the record tending to support this theory and, if believed by the jury, warranted it in finding the accused guilty of voluntary manslaughter. Hence, the court committed reversible error in giving Instruction No. 1, and in refusing to instruct the jury on the law of voluntary manslaughter. *Blankenship* v. *Commonwealth*, *supra*; *Taylor* v. *Commonwealth*, 186 Va. 587, 43 S. E. 2d 906 and authorities there cited.

The accused also complains of the court's refusal to give his Instruction No. 6 on the distinction between malice and passion. Under the facts and circumstances of the case, this instruction should have been given. It was offered in substantially the same language used by this Court in *Brown* v. *Commonwealth*, 86 Va. 466, 473, 10 S. E. 745, wherein it was said:

"To speak of a homicide as having been committed with malice aforethought and in sudden passion, upon reasonable provocation is a legal solecism. 'Malice aforethought' implies a mind under the sway of reason, whereas 'passion,' while it does not imply dethronement of reason, yet is the *furor brevis* which renders a man deaf to the value of reason, so that, although the act done was intentional of death, it was not the result of malignity of heart, but imputable to human infirmity. Passion and malice are therefore inconsistent motive powers, and hence an act which proceeds from the one cannot also

proceed from the other. * * * Malice excludes passion. Passion presupposes the absence of malice. In law they cannot coexist. Therefore, if an act of killing, prompted by malice, would be murder, it is only manslaughter when it springs from passion." *Tucker* v. *Commonwealth*, 159 Va. 1038, 167 S. E. 253; *Hannah* v. *Commonwealth*, 153 Va. 863, 149 S. E. 419.

There is no merit in the accused's contention that the court erred in refusing to grant his Instruction No. 3 on the burden of proof. This subject was amply and fully covered by other instructions given by the court.

In his closing argument the Commonwealth's Attorney said: "* * * We have the right to demand that the proper authorities convict and sentence parties who are accused after they have been submitted to a fair trial. We have that right. You members of the jury know that at the time—this particular time—in this particular community, we have been having a tremendous amount of killings; we have had an unusual number of shootings. It is up to you members of the jury—" Upon the accused's objection to this argument, the court instructed the jury to disregard the remark about other shootings in the county. This was improper argument and prejudicial to the accused. See *Sanderson* v. *Commonwealth*, 200 Va. 51, 103 S. E. 2d 800, this day decided. Upon a new trial this line of argument should not be repeated.

For the reasons stated the judgment is reversed and the case remanded for a new trial.

*Reversed and remanded.*