**Alexandria**

WILLIAM EVANS-SMITH

v.

COMMONWEALTH OF VIRGINIA

No. 0079-86

Decided October 20, 1987

COUNSEL

Blair D. Howard, David H. Moyes (Howard & Howard; Moyes & Maggs, on briefs), for appellant.

Frank S. Ferguson, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**KOONTZ, C.J.** — William Evans-Smith (appellant) was convicted in a jury trial of second degree murder in violation of Code § 18.2-32 and sentenced in accordance with the jury's recommendation to five years incarceration. On appeal, he argues that: (1) the trial court erred in admitting testimony pursuant to the state-of-mind exception to the hearsay rule; (2) the trial court erred in failing to set aside the verdict due to extraneous evidence not admitted at trial which the jury considered in its deliberations; (3) the evidence was insufficient as a matter of law to support the conviction; (4) the trial court erred in failing to set aside the verdict due to prejudicial and inaccurate statements made by the Commonwealth's attorney during closing argument; and (5) the trial court erred in failing to provide defense counsel information which the Commonwealth's attorney provided the court pursuant to a pretrial discovery order for exculpatory evidence.

I. Facts

On April 15, 1985, between 4:00 and 8:00 a.m., appellant's wife, Barbara Evans-Smith, was murdered at the couple's rural home. Although the exact time of death was not established, the medical examiner concluded that Mrs. Evans-Smith died thirty to sixty minutes after she had eaten breakfast.

Between 10:30 and 11:00 a.m., on April 15, Lesleigh Evans-Smith Cook arrived at her parents' home. Finding the outer doors unlocked, parts of the house in disarray, and receiving no response upon calling to her mother, Cook became alarmed and, using a CB car radio, summoned two friends. When they arrived, they discovered Mrs. Evans-Smith's semi-nude body in her upstairs bedroom. Her night clothes were ripped, giving the appearance of sexual assault. Her bedroom and appellant's bedroom had been ransacked, giving the appearance of a robbery. Downstairs, a hall table was overturned and some kitchen furniture had been moved. The rest of the house was undisturbed.

Mr. Evans-Smith was notified of his wife's death between 3:00 and 4:00 p.m. at his Washington office. He maintained then and at trial that his wife was alive when he left for work that morning shortly before 6:30 a.m.

Mr. Evans-Smith testified that he arose that day a few minutes before 5:00 a.m. as was his custom. He shaved, dressed in "barn clothes," and drove his car down the lane to get the newspaper. He testified that he drove with his headlights on because it was dark. On that morning, he testified that the beam of his headlights momentarily shone on a dark colored van that was parked on the opposite side of the road facing him. When he returned to the house, he parked the car in the garage and did his stable chores. He then returned to the house, ate breakfast with his wife and read the paper. Afterwards, he showered and dressed for work. Evans-Smith testified that his wife waved good-bye to him from her bedroom window as he left for work. He testified that no verbal or physical confrontation occurred between them on April 15. He further testified that he arrived at his office after dropping off some books at about 8:10 a.m., and that he worked there until the police arrived at 3:45 p.m. to inform him of his wife's death.

## II. The Hearsay Issue[1]

At trial, the thrust of the Commonwealth's case was that the Evans-Smiths' marriage was deteriorating and unhappy. The Commonwealth attempted to show that in the year prior to Mrs. Evans-Smith's death, Mr. Evans-Smith had become increasingly

---

[1] For clarity, the germane facts are recounted in relation to the issue to which they pertain.

hostile and depressed over troubles at his work, the unhappy ending of a long standing extramarital affair in August 1984, and his dissatisfaction with his marriage. These feelings of frustration and despair allegedly culminated in the murder of Barbara Evans-Smith. The Commonwealth attempted to show through the testimony of several witnesses that the victim was aware of the change in her husband's personality and that she was fearful of his increasingly volatile and hostile nature. The purported relevance of this evidence was that it would tend to prove motive and intent. Among the voluminous evidence presented was the testimony of Duane Dean, Mary Pitz and Lesleigh Cook. In ruling on the admissibility of the evidence proffered by Dean, Pitz and Cook, the court stated that no testimony as to appellant's behavior or the victim's state of mind would be allowed prior to August 1984 due to the remoteness of the events. The court reasoned that the period after August 1984 was a crucial time as it was when William Evans-Smith's extramarital affair ended and his lover moved to California.

Duane Dean was *voir dired* and testified that she had known the Evans-Smiths for five years and that subsequent to August 1984, Barbara Evans-Smith told her outside of William Evans-Smith's presence that he "was getting . . . much testier." Dean stated that Mrs. Evans-Smith "was concerned, very concerned and she felt that Bill [Evans-Smith] was becoming much more violent," and that on April 2, 1985, the victim told her that he was "often in a very bad mood [and there] was not the cooperation between them that there had been before."

Mary Pitz was *voir dired* and testified that she had been good friends with Barbara Evans-Smith for fifteen years. She stated that subsequent to August 1984, Mrs. Evans-Smith told her outside of William Evans-Smith's presence that he "was becoming more violent and easily upset." She also stated that on March 23, 1985, she and her husband were dining at the Evans-Smiths' when Mrs. Evans-Smith realized the oven was not on and she said, "Oh my God, the oven isn't on, and Bill will be angry . . . ." She proceeded to heat a casserole on top of the stove because, "Bill is going to be furious" and "I don't want any problem." Pitz also recalled an incident during December 1984 when the Evans-Smiths were leaving the Pitzes' house. Pitz stated that Mr. Evans-Smith yelled to his wife, who was talking with Mrs. Pitz at the

front door, "Dammit, Barbara, come on or I'll push you in the pond . . . ." Mrs. Evans-Smith said to Pitz: "You know, I think he would." On cross-examination Pitz acknowledged that they were standing "half a block" from the pond at the time of this exchange.

As to Pitz's testimony, the court ruled:

> The court is of the view that she may relate the kitchen incident to be shown personally to the decedent's state of mind. The court makes the same ruling respecting the incident on the steps . . . the party during Christmas of 84.

The court concluded that all of the foregoing testimony was admissible pursuant to the state-of-mind exception to the hearsay rule. *See* C. Friend, *The Law of Evidence in Virginia* § 238 (2d ed. 1983).

Both Dean and Pitz specifically acknowledged that they had never seen William Evans-Smith strike his wife and both testified that Mrs. Evans-Smith had never indicated to them that her husband had ever struck her.

Lesleigh Evans-Smith Cook was also called as a Commonwealth's witness to establish her mother's state of mind concerning Barbara Evans-Smith's fear of appellant. Cook was *voir dired* in the judge's chambers and during that examination stated that her father's personality had changed "somewhat" since August 1984 and that her mother had noticed this change and discussed it with her outside of her father's presence. Cook stated that one day during the 1984 Christmas season, she telephoned her mother who seemed "very distressed," but would not discuss the problem on the telephone. When Cook arrived at her parents' house, her mother had been crying and told Cook, "Your father tried to kill me last night." However, Barbara Evans-Smith refused to discuss any of the specifics with her daughter. Cook also stated that her mother refused to discuss the basis of her opinion or conclusions on these matters.

Defense counsel argued to the court that the victim's statements to Cook, especially, "Your father tried to kill me last night," were inadmissible because they were merely conclusions for which there was no factual basis which could be gleaned from the evidence.

Furthermore, counsel argued that the statements were inadmissible because of their highly prejudicial and potentially devastating effect on Evans-Smith's defense. Counsel also contended that the statements were inadmissible because they were not made in Evans-Smith's presence and were not part of the *res gestae*. The Commonwealth's attorney argued that the testimony was admissible to show that the victim was fearful of her husband. He argued that Mrs. Evans-Smith had related only facts, not conclusions.

In ruling on Cook's proffered testimony, the trial court stated:

> I don't know how to cure the problem the court has with the statement of ["]your father tried to kill me last night["] because I think that is an opinion and as such is not admissible. However, I do think that the witness should be permitted to testify concerning the state of mind of her mother on that occasion. I think it should be linked to the conduct of the father without reference to the attempt to kill. It shows the state of mind of [Barbara Evans-Smith].[2]

The court further ruled that Cook's testimony would be allowed to show the victim's state of mind and not for the truth of the matter asserted and the court so instructed the jury.

In open court, Cook testified that since August 1984 she had noticed that her father "was more easily angered" and stated that during the holiday season of 1984:

> I had telephoned my mother . . . and realized that she was upset so I went to the farm and she had been crying and I asked her what was wrong and at that time she related to me an incident between my mother and father that caused her to be fearful of my father . . . . She tried very hard to control her emotions but she was not able to . . . she was quite distraught and very hysterical.

---

[2] We note that the record of the judge's rulings refers to hearsay evidence being admitted as probative of the "decedent's" state of mind in some places and the "defendant's" state of mind in other places. However, the evidence was offered at trial for the purpose of showing Barbara Evans-Smith's state of mind and that is the issue the parties have briefed and argued on appeal. Accordingly, we shall not consider whether the hearsay was admissible as probative of appellant's state of mind. Rule 5A:18.

Cook also stated that her mother told her sometime between Thanksgiving 1984 and New Year's 1985 that Evans-Smith struck her, but Cook could not recall the details of that conversation. She stated that her mother told her more than once during this period that she had experienced trouble sleeping because she was "afraid."

In this appeal, the Commonwealth argues that the hearsay testimony was admissible for two reasons: (1) to refute the position taken by the defense during opening statement and throughout the trial that the Evans-Smiths' marriage was harmonious; and (2) to establish that the victim was fearful of appellant. The Commonwealth argues that this evidence was probative of motive and intent and therefore admissible under the state-of-mind exception to the rule against hearsay. We disagree.

Initially, we note that opening statements are not evidence and therefore we reject the Commonwealth's argument that hearsay evidence allegedly probative of the victim's state of mind was admissible to rebut appellant's representations during opening statement. *See Fields v. Commonwealth*, 2 Va. App. 300, 307, 343 S.E.2d 379, 382-83 (1986). While we recognize that the Commonwealth was entitled to present evidence of the Evans-Smiths' relationship, we conclude that on the facts of this case and for the reasons stated below, the evidence at issue was not admissible.

The admissibility of evidence is a matter of law to be determined by the trial judge. *Gottlieb v. Commonwealth*, 126 Va. 807, 812, 101 S.E. 872, 874 (1920). Evidence is admissible if it is both relevant and material. "[E]vidence is relevant if it tends to establish the proposition for which it is offered." C. Friend, *supra*, § 134. Evidence is material if it relates to a matter properly at issue. *Id.* However, relevant evidence should be excluded if the prejudicial effect of the evidence outweighs its probative value. *Id*; *see also Shepard v. United States*, 290 U.S. 96, 104 (1933); *Cumbee v. Commonwealth*, 219 Va. 1132, 1138, 254 S.E.2d 112, 116 (1979); *Edwards v. Syrkes*, 211 Va. 600, 601, 179 S.E.2d 902, 903 (1971); *Levine v. City of Lynchburg*, 156 Va. 1007, 1014, 159 S.E. 95, 98 (1931). The fact that some prejudice may result does not justify automatic exclusion, however. C. Friend, *supra*, § 136.

[T]he court is not applying an absolute standard but is in fact always balancing the probative value of the evidence against the disadvantages (delay, confusion, prejudice, surprise, etc.) which may attend its admission. Each decision is made in light of the individual circumstances of the case, and the same evidence might well be admitted in one case and excluded in another because the balance struck between the factors is different in the two instances.

*Id.* at § 135 (emphasis omitted).

■ Hearsay is "testimony which consists [of] a narration by one person of matters told him by another." *Williams v. Morris*, 200 Va. 413, 417, 105 S.E.2d 829, 832 (1958). The strongest justification for the exclusion of hearsay evidence is that the trier of fact has no opportunity to view the witness on cross-examination and to observe the demeanor of the out-of-court declarant to determine reliability. C. Friend, *supra*, § 224. However, "[i]f the declaration is offered solely to show that it was uttered, without regard to the truth or falsity of its content, the declaration is not excluded by the hearsay rule." *Speller v. Commonwealth*, 2 Va. App. 437, 446, 345 S.E.2d 542, 548 (1986)(citations omitted)(emphasis omitted). In addition, hearsay evidence is admissible if it falls into one of the recognized exceptions to the hearsay rule which are based on necessity and inherent trustworthiness. C. Friend, *supra*, § 230 *et seq.*

■ The "state-of-mind" exception is one of these recognized exceptions. If the declarant's state of mind is relevant to the case, then admissions of the declarant's mental state are admissible, providing that they "refer to a presently existing state of mind" and there is "no obvious indication of falsification or contrivance." C. Friend, *supra*, § 238; *accord Karnes v. Commonwealth*, 125 Va. 758, 764, 99 S.E. 562, 564 (1919); *Johnson v. Commonwealth*, 2 Va. App. 598, 602, 347 S.E.2d 163, 165 (1986).

For our analysis, we have categorized the testimony as follows: (a) the victim's statements to Pitz, Dean and Cook concerning appellant's personality and the Evans-Smiths' relationship; (b) Cook's personal observations concerning appellant's personality and the Evans-Smiths' relationship; and (c) the kitchen and pond incidents related by Pitz.

### a. The Victim's Statements to Dean, Pitz and Cook

■ We first turn to the victim's statements to Dean, Pitz and Cook that appellant was becoming testier and more violent. We agree with appellant that the trial court erred in admitting these statements under the state-of-mind exception. We reach this result because we find the proposition for which they were offered was immaterial. Evidence is not admissible unless it is material to the issues in the case. "Matters which have no logical bearing upon the case are said to be immaterial, and evidence tending to prove an immaterial matter is not admissible." C. Friend, *supra*, § 134. For these statements to have been admissible, the victim's state of mind, in itself, must have been probative of an ultimate issue in this case. C. Friend, *supra*, § 238. Here it was not. Whether Mrs. Evans-Smith feared her husband was probative of neither his motive or intent nor of the ultimate issue in the case, namely, whether William Evans-Smith murdered Barbara Evans-Smith. Certainly, had the appellant possessed motive or intent, either would have existed independent of the victim's fear of him or any other state of mind.

A victim's state of mind would be relevant in cases where the defense contends that the death was the result of suicide, accident or self-defense. In those cases, hearsay statements made by the victim illustrating his or her state of mind would be relevant, material and admissible. *See Compton v. Commonwealth*, 219 Va. 716, 729, 250 S.E.2d 749, 757 (1979)(evidence of prior relations existing between accused and victim relevant to issue of whether death was accidental); *Parsons v. Commonwealth*, 138 Va. 764, 781, 121 S.E. 68, 73 (1924)(statement of accused on the day of the murder that he was afraid of the victim relevant to material issue of self defense); *Scruggs v. Commonwealth*, 125 Va. 736, 743-44, 99 S.E. 518, 520 (1919)(evidence of victim's state of mind relevant to material issue of whether death was result of suicide). Here, however, the defense did not contend that Mrs. Evans-Smith's death was the result of suicide, accident or self-defense. Therefore, these statements were immaterial and inadmissible.

Even if we were to hold that Barbara Evans-Smith's fear of her husband was material, we find that this evidence was not probative of fear, and therefore not relevant. The victim's statements

that her husband was becoming testier and more violent may have indicated a strained and disagreeable relationship, but they did not tend to prove her fear of him. In fact, Mrs. Evans-Smith never told Pitz, Dean or Cook that she was afraid of her husband.

■ Finally, these statements were conclusions with no factual support in the record which would tend to substantiate or corroborate them. The rationale for allowing hearsay, the inherent reliability of the statement, was absent here. Further, without more detail or examples it was impossible for appellant to rebut this evidence. We also find it significant that all of Mrs. Evans-Smith's statements to Cook, Dean and Pitz concerning the purported personality changes in her husband were made outside of appellant's presence. Clearly, appellant's defense was prejudiced by being faced with the near impossible task of rebutting opinions and conclusory statements made outside of his presence by an unavailable witness who could not be cross-examined. Furthermore, the statements were made between August 1984 and New Year's 1985, some four to eight months before the victim's death. Remoteness is a factor to be weighed in determining the indicia of reliability to be accorded hearsay statements and in balancing the probative value of a statement against its prejudicial effect. *See generally Jones v. Commonwealth*, 202 Va. 236, 117 S.E.2d 67 (1960); *Belton v. Commonwealth*, 200 Va. 5, 104 S.E.2d 1 (1958). In excluding the victim's statement to Cook that, "Your father tried to kill me last night," the trial court correctly ruled that this constituted an inadmissible opinion. We believe the victim's other statements to her daughter and her friends were likewise inadmissible opinions.

For similar reasons, we hold that these statements were also inadmissible to rebut *appellant's* portrayal of the marriage as a happy one, as the Commonwealth argues. The statements were remote in time to the victim's death; they were hearsay and they were made outside of appellant's presence. Further, we do not believe that the statements were probative of *appellant's* view of the marriage. In summary, we believe their prejudicial effect outweighed any probative value.

Since these statements were not admissible pursuant to an exception to the hearsay rule and since the victim's fear was not a material issue, we find that these statements were offered for no other purpose than to show appellant's increasingly violent nature.

Although the jury was instructed that the testimony was to be considered only to illustrate Barbara Evans-Smith's state of mind, it is impossible to discern for what purpose the remarks were received by the jury.

In *Shepard*, the prosecution offered the hearsay statement by the victim, "Mr. Shepard has poisoned me," as a dying declaration at trial and it was admitted into evidence. The United States Supreme Court reversed and held the statement inadmissible as either a dying declaration or a state-of-mind exception to the hearsay rule. The Court's rationale was that the statement exceeded the bounds of proving the victim's state of mind and invaded the jury's province of determining the ultimate issue. Justice Cardozo stated:

> [The Government] did not use the declarations by Mrs. Shepard to prove her present thoughts and feelings, or even her thoughts and feelings in times past. [The Government] used the declarations as proof of an act committed by [the victim's husband] . . . . This . . . the Government was free to prove, but not by hearsay declarations. It will not do to say that the jury might accept the declarations for any light that they cast upon [the victim's state of mind] and reject them to the extent that they charged the death to someone else. Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed . . . . When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out.

290 U.S. at 104 (citations omitted). Because it is impossible to tell to what extent the jury was influenced by this prejudicial evidence, we hold that the admission of these statements constituted reversible error.

■ Our conclusion is supported by several Virginia cases dealing with statements of the victim in homicide cases. In *Mullins v. Commonwealth*, 113 Va. 787, 75 S.E. 193 (1912), the Supreme Court held as follows:

> The declarations of a person before his death, which are so connected with the act as to form a part of the same transac-

tion, and which illustrate and explain the homicide, are admissible as part of the *res gestae*, but declarations or statements not constituting a part of the *res gestae*, and not made in the presence of the accused, are not competent evidence.

*Id.* at 789, 75 S.E. at 195.

Likewise in *Belton*, the trial court committed reversible error in admitting into evidence statements made by the victim two months prior to her murder and outside of the defendant's presence. A witness in *Belton* testified that the victim stated as follows:

[s]omeone was trying to break into her apartment at night; that on one occasion she had been awakened and found the accused standing over her bed; that she was afraid of the accused and had reported to the town authorities that he was going around town armed with a gun.

200 Va. at 7, 104 S.E.2d at 3.

Finally in *Jones*, the Supreme Court held that admission of the victim's statement made more than one month before her death and outside of the defendant's presence that she thought that the accused would kill her was prejudicial and reversible error. 202 Va. at 242, 117 S.E.2d at 72. The Commonwealth attempts to distinguish these cases by pointing out that the foregoing statements were not admitted pursuant to an exception to the hearsay rule. However, we are unpersuaded by this argument as we have concluded that Mrs. Evans-Smith's state of mind was immaterial and, therefore, that the state-of-mind exception was inapplicable. Accordingly, we find that the victim's statements were inadmissible to prove the appellant's intent. C. Friend, *supra*, § 238.

Additionally, the statements were also inadmissible to prove motive. In *Scruggs*, to establish the motive for the murder the Commonwealth introduced a statement made by the victim that the defendant owed her money. The Supreme Court found the admission of this evidence to be reversible error, stating: "[M]otive can no more be proved by hearsay evidence than any other fact." 125 Va. at 746, 99 S.E. at 521.

### b. Cook's Personal Observations

We now address Cook's personal observations concerning appellant's personality and the Evans-Smiths' relationship. Cook testified that between August 1984 and the time of trial in August 1985 that she had noticed that her father "was more easily angered." She also described her mother as being "distraught," "hysterical," "depressed," and "fearful" during the 1984 holiday season. At the outset we note that Cook's personal observations of her mother are not hearsay. Lay witnesses may testify to "changes in physical conditions observed from time to time by the witness." C. Friend, *supra*, § 210. Lay witnesses may opine that a person is "ill," "suffering," or "nervous." *Id.* (footnotes omitted). In our view, however, the prejudicial effect of this evidence outweighed its probative value and the evidence should have been excluded. While this evidence may have been probative of Barbara Evans-Smith's state of mind, the fact that her state of mind was not material, together with the potentially detrimental effect of this evidence on appellant's case, compelled its exclusion. First, these observations occurred four to seven months prior to the murder and were, thus, remote in time. Although the evidence tended to explain the Evans-Smiths' relationship, it was not necessarily probative of fear, and thus, its probative value was far outweighed by its prejudicial nature. *See Cumbee*, 219 Va. at 1138, 254 S.E.2d at 116. Furthermore, because Barbara Evans-Smith's state of mind was not itself a material issue, this evidence served only to mislead the jury and to arouse their hostility towards appellant.

### c. The Pond and Kitchen Incidents

Finally, we address the pond and kitchen incidents as related by Pitz. We believe that this testimony also should have been excluded. First, the victim's state of mind was not a material issue. Even if state of mind were an issue, we believe it was impossible for the jury to have followed the court's instructions to receive the testimony only as it related to the victim's state of mind. Because we cannot say to what extent the jury was influenced by this testimony, we hold that its admission was reversible error. Furthermore, even if the victim's fear had been a material issue, this evidence should have been excluded due to its inflammatory nature and the fact that these incidents were not probative of the victim's fearful state of mind. To the contrary, there is such a wide range

of inferences that flow from these incidents that we believe it was reversible error to have admitted them as evidence of the victim's state of mind. The pond incident occurred in December 1984, four months before the victim's death. It was just as likely that Evans-Smith was joking, impatient or mildly irritated as it was evidence of a violent nature which would have made his wife fearful. Likewise, her response was susceptible to many interpretations other than fear, such as sarcasm, amusement or even indifference. Furthermore, he was "half a block" from the pond at the time of the exchange and never attempted to act on his remark. Similarly, the kitchen incident does not tend to show the victim's fear of her husband. It was just as likely probative of the everyday tensions of married life or concern with being a proper host and hostess. It is impossible to determine the context in which these remarks were made and any connection between these remarks and the victim's state of mind was tenuous at best. We believe that the admission of statements such as these is a dangerous policy and on the facts of this case, was error.

Furthermore, we believe that the admission of all of the foregoing evidence cannot be deemed harmless because the circumstantial evidence of appellant's guilt aside from this evidence was "not so overwhelming as to establish the guilt of the accused beyond a reasonable doubt." *Harryman v. Estelle*, 616 F.2d 870, 876 (8th Cir.), *cert. denied*, 449 U.S. 860 (1980).

### III. Juror Misconduct Issue

At trial, the defense contended that Mrs. Evans-Smith was killed by intruders during a rape-robbery attempt. To this end, appellant testified that he had seen a suspicious looking dark colored van parked 300 to 400 feet away on the road in front of his driveway when he retrieved the newspaper shortly after 5:00 a.m. on April 15. He noticed the van because the beam from his headlights was reflected by it. A witness, Tracy Dillon, testified that about 8:30 a.m. on April 15, a green van with Louisiana license plates pulled out in front of her on a road near the Evans-Smiths' house. She reported the incident to the police because the van pulled out very abruptly and would not let her pass. In addition, defense counsel also presented evidence that tire tracks were seen in a hay field 200 to 300 feet away from the victim's house. Evidence was also introduced that two horsetrainers from a com-

mercial race track in West Virginia were working at a neighboring farm on the morning of the murder. The defense attempted to implicate these men as Mrs. Evans-Smith's assailants.

Four days after the jury rendered its verdict, juror Christine Nelson disclosed to defense counsel that another juror had consulted an almanac outside of the jury room and had discussed his findings inside the jury room during jury deliberations. According to Nelson, the juror checked the time of sunrise on April 15, 1985, to determine whether appellant was telling the truth. The almanac revealed that the sun had already risen at the time appellant testified he turned on his headlights. Nelson stated that she had voted "not guilty" in the two votes that were taken during the first four days of deliberation, but after she evaluated this information (which she alleged was discussed in the jury room on the fifth day of deliberations) and, after the other jurors told her that if sentenced to five years Evans-Smith would serve only one, Nelson changed her vote to "guilty."

Defense counsel made a post trial motion to set aside the verdict based on juror misconduct. The trial court initially refused defense counsel's offer of juror Nelson's testimony and her affidavit, stating:

[T]his Court I think must base its decision on your motion with what it deems to be the law of the Supreme Court of Virginia. Your motion to have this affidavit received in evidence and to put this juror on the witness stand is denied.

However, the court allowed defense counsel to vouch the record with her testimony and affidavit. Additionally, the Commonwealth's attorney cross-examined Nelson.

Upon a motion to reconsider, the court reversed itself and received Nelson's affidavit (but not her testimony)[3] as well as seven

---

[3] Appellant states on brief: "Although the trial judge in the Evans-Smith case did reconsider and receive testimony on the question of extraneous information, he made no determination as to whether this evidence was prejudicial or even whether it might have prejudiced the defendant under the *Brittle* 'test.' The trial judge simply reasoned that it was improper to impeach a juror's vote." Our examination of the record shows this to be an incorrect account. The trial court initially refused to consider Nelson's affidavit or testimony, but allowed defense counsel to proffer them to the court. Later, the court received Nelson's affidavit, but not her testimony. The court then decided to receive the other seven

identical affidavits from other members of the jury offered by the Commonwealth. These affidavits essentially rebutted Nelson's. The affidavits conceded that the jury had discussed the almanac information, but each of the seven jurors stated he or she was not influenced by the information. They further stated that the jury vote was eleven to one in favor of guilt both before and after the almanac information was revealed and that a unanimous vote of guilty was not reached until the fifth day of deliberations after the jury had been given the *Allen* charge. These jurors stated that the almanac discussion occurred on the fourth day of deliberations and not on the fifth as Nelson alleged and they also denied that the verdict was a "quotient" verdict. The trial court refused to recall the jurors and question them in open court. In denying the motion to set aside the verdict, the trial court judge reviewed the applicable case law and quoted *Bull v. Commonwealth*, 55 Va. (14 Gratt.) 613, 633 (1857) as follows:

> The verdict is surely the best evidence of [a juror's] opinion of the case; and he at least should not be permitted, as a general rule, to impeach it . . . . The jury may be polled, and ought to be, if there is the least doubt of the free concurrence of all the jury in the verdict . . . . Is it not more reasonable that this easy legal precaution should be used, than that affidavits should be obtained of the jurors after their discharge, and made the foundation of a motion for a new trial? Again: the court, if not satisfied with the verdict, may and might set it aside. And if it improperly refuse to do so, the appellate court may revise and reverse the judgment.

On appeal, appellant argues that the trial court erred in failing to set aside the verdict where the jury considered extraneous evidence not presented in open court and where appellant was effectively denied his sixth amendment right to confrontation.

The Commonwealth argues that the jury's consideration of the almanac information was not improper because it was a proper

---

affidavits, but refused to hear the testimony of any jurors. Thus, the court never actually considered testimony of any of the jurors. Even though Christine Nelson's testimony appears in the record, it was simply a proffer. For this reason we have addressed this issue as follows: (1) whether the trial court erred in failing to summon and examine the jurors; and (2) whether the trial court erred in failing to set aside the verdict.

subject matter for judicial notice and it was correct. The Commonwealth urges us to extend the court's power of judicial notice to the jury. Furthermore, the court was correct in its original decision to refuse affidavits and testimony because, the Commonwealth asserts, such evidence is not admissible to impeach a jury verdict. Presentation of affidavits and testimony is proper only in a case where the alleged taint arose from external forces outside of the jury. Finally, the Commonwealth notes that this matter was within the court's sound discretion and should not now be disturbed because appellant has not shown an abuse of discretion. For the reasons stated below, we disagree.

Generally, "the testimony of jurors ought not to be received to impeach their verdict, especially on the ground of their own misconduct." *Bull*, 55 Va. (14 Gratt.) at 632; *accord Caterpillar Tractor Co. v. Hulvey*, 233 Va. 77, 82, 353 S.E.2d 747, 750 (1987); *see also Commercial Union Ins. Co. v. Moorefield*, 231 Va. 260, 265, 343 S.E.2d 329, 333 (1986). The rationale for this rule is to avoid jury tampering, to discourage jurymen from changing their minds, to emphasize the importance and solemnity of the jurors' role, and to ensure the finality of verdicts. However, there is strong public policy and legal precedent which mandates the interrogation of jurors to determine if an impropriety has tainted the verdict. "An exception to the general rule limiting post-verdict examination of jurors is recognized when it appears that matters not in evidence may have come to the attention of one or more jurors so as to violate the defendant's constitutional right to be confronted with the witnesses against him." 19 Michie's Jurisprudence *Verdict* § 34 (Repl. Vol. 1979).

> In considering a motion to set aside when juror misconduct is alleged, the trial court has the affirmative duty "to investigate the charges and to ascertain whether or not, as a matter of fact, the jury was guity of such misconduct." *Kearns v. Hall*, 197 Va. 736, 743, 91 S.E.2d 648, 653 (1956). The trial court may properly summon one or more jurors to testify under oath in open court and to answer relevant questions propounded by the court and counsel about what had transpired. *Dozier v. Morrisette*, 198 Va. 37, 40, 92 S.E.2d 366, 368 (1956). This is an *exception* to the general rule that testimony of jurors is inadmissible to impeach their verdict. *Id.*, 92 S.E.2d at 368. Ordinarily, jurors will not be allowed "to

explain their verdict by stating the reasons upon which their conclusions are based." *Federal Deposit Insurance Corp. v. Mapp*, 184 Va. 970, 983, 37 S.E.2d 23, 28 (1946).

*Commercial Union Ins. Co.*, 231 Va. at 265, 343 S.E.2d at 333 (emphasis added); *see also Haddad v. Commonwealth*, 229 Va. 325, 330, 329 S.E.2d 17, 20 (1985). Historically, courts have been more willing to examine allegations of juror misconduct which originate in sources outside of the jury. A juror who himself alleges the misconduct of a jury on which he has served is subject to particular scrutiny and is treated with great caution. *See, e.g., Bull*, 55 Va. (14 Gratt.) at 632-33.

A motion for a new trial based on juror misconduct cannot be sustained on juror affidavits alone. However, such affidavits may provide "sufficient [cause] to require the trial court to investigate the matters recited in the document." *Commercial Union Ins. Co.*, 231 Va. at 265, 343 S.E.2d at 333 (citations omitted); *see also Kearns v. Hall*, 197 Va. at 741-42, 91 S.E.2d at 652. Accordingly, when the information disclosed in the jurors' affidavits indicates that injustice probably occurred, the trial court has an affirmative duty to further investigate whether juror misconduct occurred. *Commercial Union Ins. Co.*, 231 Va. at 265, 343 S.E.2d at 333.

As we have recognized, "[a] juror may not properly receive any information about a case he is hearing except in open court and in the manner provided by law." *Brittle v. Commonwealth*, 222 Va. 518, 522, 281 S.E.2d 889, 890 (1981)(citing *Crockett v. Commonwealth*, 187 Va. 687, 706, 47 S.E.2d 377, 386 (1948)); *accord Hinton v. Gallagher*, 190 Va. 421, 432, 57 S.E.2d 131, 136 (1950). However, the reception of such evidence, *aliunde*, is harmless error and will not be considered as grounds for setting aside the verdict unless "there is sufficient ground to believe that . . . an accused . . . has been prejudiced by receipt of the information." *Brittle*, 222 Va. at 522, 281 S.E.2d at 890 (citations omitted); *accord Crockett*, 187 Va. at 705-06, 47 S.E.2d at 386.

> The test in a criminal case is not whether the jurors were actually prejudiced by the extraneous matter, but whether they might have been so prejudiced. If they might have been prejudiced, then the purity of the verdict is open to serious doubt and the verdict should be set aside and a new trial

awarded.

*Thompson v. Commonwealth*, 193 Va. 704, 715, 70 S.E.2d 284, 290 (1952)(citations omitted); *accord Brittle*, 222 Va. at 522, 281 S.E.2d at 890. Furthermore, "only slight evidence of influence or prejudice . . . should be required to warrant the granting of a new trial." *Crockett*, 187 Va. at 705, 47 S.E.2d at 386 (citations omitted).

Against this background, we turn to the present facts to determine whether the trial court erred in denying appellant's motion to set aside the verdict. Initially, we hold that it was improper for a juror to have consulted an almanac outside of the jury room to determine the time of sunrise on April 15 and to have discussed this matter in the jury room during deliberations. "It is always improper for a juror . . . to receive any information about [a cause] except in open court and in the manner provided by the law . . . ." *Crockett*, 187 Va. at 706, 47 S.E.2d at 386 (citations omitted). We are not persuaded by the Commonwealth's contention that the almanac information was a proper subject matter for the jury's consideration simply because an almanac report of sunrise is a proper subject matter for judicial notice. Virginia courts have not extended this privilege to the jury and we decline to take this opportunity to do so. *See* C. Friend, *supra*, § 287. We further note that the time of sunrise contained in an almanac is not the equivalent of common sense, knowledge, and experience upon which a juror may rely. *Id.* We also decline to accept the Commonwealth's contention that the almanac information was not offensive because it was true. It is simply impossible to determine the truth of such information absent its being received as evidence in open court and subject to cross examination.

We also must determine whether the trial court erred in refusing to summon and examine the jurors to determine whether misconduct occurred, and if so, the effect of that misconduct. Preliminarily, we note that we support the judicial policy of treating with particular wariness and scrutiny a dissident juror who comes forth to identify juror misconduct. We believe, however, that this case merited further inquiry by the trial court because the misconduct alleged by Nelson was corroborated by seven of the eleven other jurors. The trial court concluded after evaluating all eight affidavits and applicable case law that Christine Nelson's affidavit and

the seven other affidavits were insufficient "to serve as the basis for the granting of a new trial in this case." The court's rationale was that Nelson's affidavit did not state a sufficient claim of jury misconduct which would allow her to impeach the verdict. The court determined that her affidavit "states a conclusion only . . . but states no specific fact such as the hour of sunrise in a given geographical location . . . . Most importantly, the affidavit of Nelson contains a recitation of mental processes concerning how she reached that verdict."

 The principle is well settled that a juror may not impeach a verdict solely upon his mental processes. *See Downey v. Peyton*, 451 F.2d 236, 239 (4th Cir. 1971); *Washington Luna Park Co. v. Goodrich*, 110 Va. 692, 698, 66 S.E. 977, 979 (1910)(citations omitted); *Bull*, 55 Va. (14 Gratt.) at 632; 19 Michie's Jurisprudence *Verdict* § 34 (Repl. Vol. 1979). Here, however, the alleged misconduct was not the jurors' mental processes, but the evidence, *aliunde*, which may have influenced their mental processes. When there is a probability that such external evidence has influenced the jury, the court has "the affirmative duty 'to investigate the charges and to ascertain whether . . . as a matter of fact, the jury was guilty of such misconduct.'" *Commercial Union Ins. Co.*, 231 Va. at 265, 343 S.E.2d at 333 (quoting *Kearns v. Hall*, 197 Va. at 743, 91 S.E.2d at 653). Accordingly, we hold that the affidavits proffered to the court and made a part of the record warranted further investigation by the court.

In this regard, we hold that the trial court erred as a matter of law in concluding that no further investigation concerning the almanac information was warranted. Implicit in the court's decision that the affidavits were insufficient "to serve as the basis for the granting of a new trial in this case," was the conclusion that no probability of prejudice arose from the almanac information. The trial court also noted: "[N]o almanac will tell you whether it was daylight at a given hour. It only gives sunrise . . . . Knowing when the sun rises under the facts of this case, it being very early in the morning, the hour of sunrise is not conclusive of whether it was daylight or dark." We disagree.

We conclude that the probability of prejudice to the appellant flowing from the jury's consideration of the almanac information was great because the purpose for which the evidence, *aliunde*, was considered went to an ultimate issue in the case. The juror

consulted the almanac to determine whether appellant was lying about seeing a mysterious van parked near his home on the morning of his wife's murder. Evans-Smith's entire defense rested on the theory that his wife was murdered during a rape and robbery attempt by intruders in a van. Whether the jury believed Evans-Smith's testimony that a van was parked just outside his driveway was paramount in determining the ultimate issue of guilt or innocence in this circumstantial evidence case. The very essence of Evans-Smith's case was his credibility and veracity. For this reason we believe that it was absolutely essential that appellant be given an opportunity to confront and cross-examine this evidence against him.

We also find the circumstances surrounding the jury's deliberations and the jurors' affidavits strongly indicative of probable misconduct and prejudice which would warrant further investigation. The jury began its deliberations on Monday, August 26, 1985. They deliberated on Monday afternoon, August 26, all of Tuesday, August 27, Wednesday, August 28, and Thursday, August 29. The almanac information was allegedly considered on Wednesday or Thursday. On Friday morning, August 30, the day the long Labor Day weekend began, the foreman informed the court that the jury was deadlocked. The court then delivered the *Allen* charge to the jury and urged them to reach a verdict. At 4:40 p.m., the jury returned with a verdict of guilty. As to the jurors' affidavits, we note that four jurors expressed no opinion by way of affidavit as to the almanac information. Clearly, the testimony of these four jurors, as well as the remaining eight, was necessary to determine whether the jurors might have been prejudiced.

Therefore, we conclude that the trial court erred as a matter of law in failing to summon and receive testimony from all of the jurors in order to determine whether the jurors might have been influenced by the consideration of the extraneous almanac information. Accordingly, we need not reach the question whether the trial court erred in failing to set aside the verdict. Further, since we are remanding this case for retrial, it is not necessary that we remand this case to the trial court for further inquiry into the jurors' potential prejudice.

## IV. Other issues

Appellant also argues that the trial court erred in failing to set aside the verdict due to prejudicial and inaccurate statements made by the Commonwealth's attorney during closing argument and that the trial court erred in failing to provide defense counsel with certain allegedly exculpatory evidence supplied to the court by the Commonwealth's attorney. Appellant further argues that the evidence was insufficient to support the conviction. However, since we reverse and remand for a new trial based on the hearsay and juror misconduct issues, and since we do not know whether these issues will arise upon retrial, and if so, in what factual context, we find that it is not necessary to decide these issues at this time and we decline to do so.

In summary, we conclude that the trial court erred in admitting certain statements made by the victim pursuant to the state-of-mind exception to the hearsay rule, and we find that the court erred in admitting certain observations made by Lesleigh Cook. We further find that the trial court erred in failing to summon and examine the jurors to determine whether they may have been influenced by their consideration of the extraneous almanac information. For these reasons, the conviction is reversed and the case is remanded for a new trial, if the Commonwealth be so advised.

*Reversed and remanded.*

Duff, J., and Hodges, J., concurred.