## CIRCUIT COURT OF HENRICO COUNTY

Henrico County School Board

v.

David Compton
and Amelia Compton

November 21, 1988

Case No. 87C329

By JUDGE JAMES E. KULP

The following is the Court's opinion in the above-captioned case. Due to the nature of the case, the Court by letter of August 31, 1988, advised counsel of the Court's decision in this matter. Because of the significance of this case to all concerned, the Court wanted the opportunity to explain its decisions in writing.

I. *Background.*

Samuel Compton is the twelve-year old adopted son of David and Amelia Compton. Samuel has been attending school of Henrico County and has been identified as a handicapped child within the meaning of § 22.1-213(1) of the Code of Virginia. After a series of hospitalizations, Mr. and Mrs. Compton requested that the School Board place Sam in a residential school. Upon the School Board's rejection of a residential placement, the Comptons requested a due process hearing provided for by § 22.1-214(B) and Regulations Governing Special Education Programs for Handi-

capped Children and Youth in Virginia, II. C1, pp. 45-64. On December 12, 1986, the local hearing officer rendered a decision which included, among other things, that Sam should be placed in a residential setting.

Both parties appealed the decision of the hearing officer, and the matter was heard by a State reviewing officer appointed by the Virginia State Department of Education. On March 27, 1987, the State reviewing officer rendered an opinion in favor of the parents as to residential placement.

On April 1, 1988, the School Board filed an appeal with this Court pursuant to § 22.1-214(D). This Court conducted a hearing on April 18, 1988, at which time both parties presented additional evidence.

After reviewing the extensive records of the administrative proceedings, the evidence presented on April 18, the memoranda filed by the parties, and the applicable authorities, this Court found that the decision of the State reviewing officer requiring a residential placement for Sam was in error and should be reversed.

II. *Scope of Review.*

The standard of review by this Court is set forth in § 22.1-214(D). Upon an appeal, this Court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate."

The Court of Appeals has recently fleshed-out the standard of review in *Beasley v. School Board of Campbell County*, 6 Va. App. 206 (1988). While this Court is "required to give special or due weight to the findings of the reviewing officer," the scope of review is broader than that applicable to appeals of agency decisions. *Id.* at 212. Citing *Board of Education v. Rowley*, 458 U.S. 176 (1982), the Court of Appeals held that "the proper standard for the circuit court is to determine, based on a preponderance of the evidence, whether the substance of the proposed individualized educational program is reasonably calculated to enable the child to receive educational benefits." 6 Va. App. at 212.

III. *Facts.*

Without attempting to set forth all the facts in this case, the Court will set forth those facts which are essential to the Court's decision.

During the first and second grades, Sam attended regular classes in the County schools. His second grade teacher requested that Sam be evaluated since private evaluators had recommended consideration of an LD placement. After an appropriate review, the school eligibility committee found Sam to be performing educationally at grade level and therefore not eligible for special placement.

On January 8, 1985, while enrolled in the third grade, Sam was found eligible for learning disability/emotionally disturbed special education services. Beginning on February 4, 1985, Sam was placed in a class under the guidance of Mrs. Burton, a teacher trained and experienced in teaching children with learning disabilities and who are emotionally disturbed. Sam remained in Mrs. Burton's class until March 21, 1985, when his parents placed him in the Psychiatric Institute of Richmond (PIR). This placement resulted from events which occurred outside of school and was based upon a finding that Sam "had reached a point where he was of significant potential danger to others and possibly to himself." (Parents' Exhibit 30). Sam was released from PIR on July 12, 1985, but was readmitted on August 23, 1985. Again this admission was precipitated by events which occurred outside the school environment. Sam was found to have threatened several neighborhood children, as well as his two younger brothers, with his father's hunting knife which he had taken and hidden in the woods. This conduct was consistent with Sam's conduct since age four in that he had threatened to harm others, as well as threatened to kill his parents. (Parents' Exhibit 43).

Sam remained at PIR until September 13, 1985, when he returned home and re-entered Mrs. Burton's ED class. On October 17, 1985, Sam was again referred to PIR. This time his outpatient therapist, Dr. Bill Burke, made the referral in order to re-evaluate Sam's "behaviors at this time are explosive and physically threatening, not only to himself but to those in his environment." (Parents' Exhibit 47). While there were several episodes of fighting

at school, the more serious events involved actions involving his parents and non-school activities. Sam had to be restrained by his father as he had physically attacked his mother, and he had been excluded from the Cub Scouts due to his conduct.

Once again, Sam was released from PIR on November 23, 1985, when he returned home and re-entered school.

Sam was once again admitted to PIR on March 6, 1986, for physical aggression toward adults, peers, and family members. The main impetus for this admission was that Sam had broken a window at school during an argument with his mother after school hours and had struck his mother with his book bag and his fists. Due to problems with insurance, Sam was involuntarily committed to the DeJarnette Center, a state psychiatric hospital, by order of the Juvenile and Domestic Relations District Court on March 26, 1986. While at the DeJarnette Center, Sam was certified to be mentally ill, unable to care for himself as a result of mental illness, and dangerous to others. (Parents' Exhibit 72).

Sam was transferred from the DeJarnette Center to the hospital unit at the Virginia Treatment Center for Children (VTCC) on December 19, 1986. He remained in the hospital program until March, 1987, when he was transferred to VTCC's Partial Hospitalization Program. During this time Sam lived at home but attended school and received treatment at VTCC. Sam was readmitted to the inpatient hospital program at VTCC on December 18, 1987, because "Sam was no longer safe at his home environment, nor were his siblings safe from Sam." (School Board's Trial Exhibit 78). Commencing on February 12, 1988, Sam has been residing in the VTCC's inpatient hospital unit and attending school in the classroom at VTCC. Sam visits at home on weekends, and the Comptons participate in family therapy.

Throughout these episodes, Sam has been advancing educationally. His report cards through the years have established his instructional levels to be age appropriate. Standardized tests show that Sam has been functioning at grade level or above in all subjects and over two years above grade level in reading and written language. (Parents' Exhibit 61).

IV. *Law*

Congress passed The Education of the Handicapped Act, 20 U.S.C. § 1401 *et seq.*, in order to provide federal funds to assist the states in educating handicapped children. These funds are conditional upon the states setting up elaborate procedures to ensure that the goals announced by Congress would be met. Virginia has complied with the congressional mandate by enacting §§ 22.1-213 through 22.1-221, and the extensive regulations adopted by the State Board of Education.

The thrust of the federal act is to assure "all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). The United States Supreme Court in *Rowley, supra,* held that a "free appropriate public education" is satisfied "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Id.* at 203. The Court rejected the proposition that states were required to implement a program which would maximize each child's potential.

The tool for ensuring that Congress' intention that each handicapped child be educated according to the child's unique needs and capabilities is found in the individualized educational program. (IEP). The IEP must be formulated in such a way that it is "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." 458 U.S. at 204.

The Court of Appeals of Virginia has on two occasions discussed the requirements of the federal act and the Virginia statutes. In *Martin v. School Board of Prince George County,* 5 Va. App. 197 (1986), the Court reviewed the basic requirements of the federal act and particularly how it applied to a child who not only had a learning disability, but also suffered from an emotional disability. In such cases, the Court concluded that the inquiry is "whether a residential placement was a 'necessary ingredient for learning'." *Id.* at 210. In *Beasley v. School Board of Campbell County,* 6 Va. App. 206 (1988), the Court applied the law to the facts in determining a residential placement was required.

V. *Application of Law*

The State Review Officer concluded that "Samuel's problems are at such a stage that the educational component and the psychological and behavioral component cannot be segregated -- they are intertwined." (Opinion, p. 28). In *Martin*, the Court of Appeals recognized the difficult task of separating medical, social and educational problems. Just because the task is difficult, however, does not mean that it cannot be done. This is the reason that the relevant inquiry is "whether a residential placement was 'a necessary ingredient for learning'." 3 Va. App. at 210.

The evidence of Mrs. Burton, who was Sam's teacher, was that once he began to get direct teaching in the self-contained classroom, he showed significant educational progress. Sam's grades in reading, spelling and math improved. Sam also started to show improvement in writing. (School Board Exhibit 18; Tr. II, 278-79). Even when Sam was receiving instruction in a small group setting while hospitalized at PIR in March, 1986, he was enrolled in the regular 4th grade program. (School Board Exhibit 15). As previously noted, standardized tests showed Sam to be functioning at grade level or better in all subjects and over two years above grade level in reading and written language.

While recognizing that being on grade level is an important ingredient in determining whether a child is receiving an appropriate education, the State Reviewing Officer concluded that it is not the sole and controlling factor. While it is not the sole criteria, the Supreme Court in *Rowley* observed that "[t]he grading and advancement system thus constitutes an important factor in determining educational benefit." 458 U.S. at 203. If education is the goal of the federal act, then the fact that a child is shown to be progressing satisfactorily in school subjects as established by tests should be accorded more weight than given by the State Review Officer. In this case, we are not dealing with a child who is barely skimming by or one who has been the subject of social promotions. Sam was performing above average in the public school system and was receiving substantial specialized instruc-

tion. In this Court's view, this should be dispositive of the issue in this case. *See* 458 U.S. at 203 n. 25.

The fact that Sam was receiving an appropriate public education in the County schools was not only shown by the administrative proceeding records, but was underscored by testimony given before this Court on April 18, 1988. Mrs. Shirley Wiley, coordinator of education programs at VTCC, testified that in her opinion, Sam would most likely show academic progress in an ED self-contained program in the County schools. This same opinion was expressed in the testimony of Mrs. Jane Matthews and Dr. Dorothy Jones, both of whom have extensive backgrounds in educating handicapped children.

To a large extent, the State Review Officer premised his decision on what he concluded was a showing that the Comptons had not been allowed input into the proposed IEP for '86-'87. The State Review Officer further concluded that no credence could be given to the IEP for '85-'86, therefore no confidence could be given to the IEP for '86-'87.

The first premise is contradicted by the evidence. During the due process hearing, Mrs. Compton clearly testified that she had attended a meeting concerning an IEP for '86-'87. Mrs. Compton admitted that during this meeting, she was specifically asked to state the objectives she would want included in the IEP. Mrs. Compton further admitted that she was allowed to comment on the objectives. (Tr. I, 111-114). Furthermore, at the hearing before this Court on April 18, 1988, Dr. Jo Lynne DeMary, Director for Special Education for Henrico Schools, testified that she was present at the meeting when the IEP for '86-'87 was prepared and that the Comptons participated. She further testified that some of the goals suggested by the Comptons were in fact included in final IEP. Dr. DeMary further denied that the forms had been prepared before the meeting. The Court accepts this testimony and finds that the Comptons were given an opportunity for input into the preparation of the proposed IEP for '86-'87.

It may well be that the Comptons feel they did not have as much input into the preparation of the IEP as they would have liked. The answer to this seems to be found in the attitude exhibited by the Comptons at the IEP meeting. Mrs. Compton testified they had been denied

their request for a residential placement and thereafter submitted a request for a due process hearing (Tr. I, 112-114). This Court concludes that any limitations on the Comptons toward the preparation of the IEP was self imposed and cannot be imputed to the School Board.

The Court also finds the State Review Officer was incorrect is not giving credence to the '85-'86 IEP. The State Review Officer found that some dates on the IEP were incorrect and therefore concluded that it could not be accepted. This finding was made in spite of the testimony of Mrs. Burton admitting that she had inadvertently written in 1986 instead of 1985 in some places. Additionally, Mrs. Burton testified before this Court that she had made some entries in the IEP showing that Sam had mastered some of the activities while hospitalized. These entries were based upon information furnished by Sam's teacher at PIR.

The Court finds that these incorrect dates are too thin a reed to conclude, as did the State Review Officer (Opinion, p. 32), that Mrs. Burton and/or the School Board were presenting false evidence. This Court will not ascribe such a base motive on the part of Mrs. Burton or the School Board on the basis of this evidence and accepts Mrs. Burton's explanations as reasonable and true.

As the School Board notes, the records of VTCC also contain a mistake in the dates in its partial hospitalization notes. (School Board Tr. Exhibit 70). No one suggests that the Court disregard the records from VTCC because of the inadvertent error in the date, nor would any such suggestion be taken seriously.

The Court further finds that the State Review Officer has apparently misperceived the functions of the IEP. He criticized both the '85-'86 and '86-'87 IEPs as being so general as to be of little value to a parent or to the reviewing officer. (Opinion, p. 31). The U.S. Department of Education has clearly indicated that the IEP is not intended to be detailed enough to be used as an instructional plan, but rather is to set the general direction to be taken by those who will implement the IEP. 34 C.F.R. Part 300, Appendix C, p. 84. Further, the Department has found that the federal IEP can usually be met in a one to three page form and leaves it to the discretion of

the State and local authorities to prescribe the form and length of the IEP. *Id.* at 87.

## VI. *Conclusion*

Upon a review of all the evidence in this matter, the Court finds by a preponderance of the evidence that the substance of the proposed IEP for '86-'87 was reasonably calculated to enable Sam Compton to receive educational benefits. It could be argued that Sam's educational benefits might be maximized by a residential placement, but such is not required by law.

The Court believes that the admonition of the Supreme Court in *Rowley, supra,* that "courts must be careful to avoid imposing their view of preferable educational methods upon the States," 458 U.S. at 207, is applicable to this case. Such admonition applies with equal validity to decisions of the State Review Officers as to courts.

A fair reading of the evidence in this case establishes that Sam has performed well educationally speaking, regardless of the setting in which he has been placed. This allows the Court to confidently conclude that Sam's educational component can be separated from his psychological and behavioral component. There is no question in this Court's mind that Sam needs treatment for his emotional disability. For the reasons given, however, this responsibility does not fall upon the School Board.

Because of the Court's disposition of this case, the Court does not address the State Review Officer's alternate theory that Virginia has chosen to provide greater rights and more expansive rights than required by the federal law.