COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Fulton and Ortiz
Argued at Norfolk, Virginia


MELISSA NANETTE DIAZ

OPINION BY
v.        Record No. 0056-23-1        JUDGE JUNIUS P. FULTON, III
FEBRUARY 27, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Kevin M. Duffan, Judge

Richard Alonzo Edgington, Assistant Public Defender, for appellant.

Victoria Johnson, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Melissa Nanette Diaz appeals her convictions following a jury trial for the second-degree

murder of Steven Wynn, use of a firearm in that murder, and concealing and defiling a dead body,

in violation of Code §§ 18.2-32, -53.1, -126, and -323.02. On appeal, Diaz argues that the trial court

erred by granting the Commonwealth's pre-trial motion to redact certain portions of Diaz's recorded

police interrogation wherein she referenced Wynn's status as a probationer, as well as by restricting

Diaz from testifying about that status. Further, Diaz argues that the trial court also erred in

admitting printed screenshots of Facebook comments and messages from Wynn's Facebook profile,

purportedly posted by Diaz. Finally, Diaz challenges the sufficiency of the evidence for both the

second-degree murder conviction, as well as the defiling a dead body conviction. For the following

reasons, we affirm.

BACKGROUND

On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth," the prevailing party below. *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

*I. The Offense and Subsequent Police Investigation*

Diaz and her boyfriend, Steven Wynn, checked into a Red Roof Inn in Virginia Beach, Virginia, on February 1, 2020. They rented Room 118 for an entire week, until February 8, and paid upfront in cash. Diaz displayed the "Do Not Disturb" sign on the hotel room door through the entirety of the stay, and when housekeeping offered to clean the room, Diaz said that she would clean the room herself. Housekeeping staff told Diaz she could use any supplies that were on the housekeeping cart, and Diaz requested a broom and extra sheets.

On February 7, Diaz told a member of the housekeeping staff, Vivian Williams, that she had bought a grandfather clock and that it had been delivered to the hotel. Later that same day, Diaz asked for clean sheets and some bleach, which Williams provided. On the morning of February 8, the day Diaz checked out of the hotel, Williams saw Diaz in the hotel parking lot. At the time, Diaz appeared "jolly" and "happy."

Later that same day, Diaz approached Cornelius Johnson—a truck driver who often frequented the Red Roof Inn—in the hotel parking lot and asked if he could help her move a clock. Diaz appeared to be "in a hurry." Diaz's vehicle—a gold Nissan Murano—was backed into a parking space near the sidewalk, and "an older guy" with dreadlocks was with her. Johnson saw a

large object that he estimated to be 5'6" or 5'7" tall, wrapped up in white sheets, standing on a moving dolly. The object had an ironing board behind it. Williams, who saw the group moving the item, came over to the Murano as well, to offer to help. The older gentleman, Durrell Short, was on his knees in the front passenger seat, facing the back seat, and Johnson, who was outside the car, picked the object up to place it in the back seat. The object bent when Johnson loaded it in the Murano. Diaz stated, "I think we broke it; it's okay."

At trial, Williams testified that, when the object bent, "an odor hit [her] nose" and she said, "What the fuck is that smell." Diaz and Short looked at each other and did not respond. Williams looked down at the shape of the "supposed grandfather clock" and walked away. Johnson backed away and did not further assist but watched as Diaz and Short loaded various items including tools into the vehicle. Williams testified at trial, without objection, that Johnson told her, "That wasn't a clock. That was a fucking body."

After Diaz and Short left, Williams went to the front desk and asked the front desk agent to call the police because "they have a body back there." The front desk agent did not believe Williams and did not call the police. Williams refused to clean Room 118, but two other members of the housekeeping staff did so. They bagged up the belongings Diaz had left in the room and put them in the hotel's maintenance closet. Robert Kwade, the front desk clerk, went into the room and did not smell any odors. Hotel staff called the hotel manager, Trina Thomas, and she told them to call the police.

The next day, Sergeant Michael Marsolais of the Virginia Beach Police Department responded to the hotel based on the police report. Through interviews of Johnson and Williams, as well as his review of the room registration information, Marsolais developed Diaz as a suspect. He and Lieutenant Pete Koepp then went to Diaz's house to investigate further. Koepp arrived first and observed Diaz come out of the house carrying a white spray bottle, which she sprayed inside a gold

- 3 -

Nissan Murano that was parked outside of her home. She then went back inside. When Marsolais arrived, the officers decided to do a "knock and talk," and see if Diaz would speak to them. As they approached the house, they walked by the Nissan Murano; the window was partially lowered, and Koepp saw a large object wrapped in sheets with a moving dolly lying on top of it. The officers obtained a search warrant for the home, and upon searching the home, the police found Diaz hiding in a "void in the wall in the attic."

The officers escorted Diaz outside to a patrol car. Marsolais testified that Diaz was read her *Miranda*[1] rights, and subsequently asked some initial questions by Koepp. Koepp asked Diaz if she knew why the police were there. Diaz responded that she did, started crying, and said "that she was tired of the beatings and she couldn't take it anymore." She told Koepp that her boyfriend was in the car. The police recovered a trash bag containing pillows, latex gloves, and duct tape from the back of Diaz's Murano. They also recovered Wynn's body. Wynn's corpse was wrapped in several layers of various materials including bedding, cardboard boxes, trash bags, a tarp, a mattress pad, towels, plastic grocery bags, pillows, and miscellaneous articles of clothing. The wrappings were secured by torn bedsheet strips, and at one point a belt. An ironing board was found inside the wrappings. Wynn's face was bloody and unrecognizable. There were trash bags packed around Wynn's head, he had visible tattoos, and he was clad in his underwear. Wynn died from a gunshot wound to the right temple, which exited the left side of his head. Wynn's body was too decomposed to determine whether the gunshot wound had been inflicted at close range.

Diaz was then taken to the Virginia Beach Police Detective's Bureau, where Marsolais questioned her. The interrogation was recorded and ultimately admitted at trial as one of the Commonwealth's exhibits. Diaz told Marsolais that, during the time she and Wynn were staying in the hotel, she would drive Wynn to another house where he would stay all day and that she would

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

pick him back up when he texted her. Diaz alleged that he was engaging in a sexual relationship with a prostitute at this location. Wynn used cocaine and played video games in the evenings, and the two of them frequently argued. Diaz said that on Wednesday, February 5, Wynn was sitting in a chair in the hotel room trying to buy some cocaine. He "might have been unsuccessful." He then came over to the bed, where Diaz was sitting, and struck her once on each leg with the butt of a firearm. Wynn then set the firearm down. Diaz said that she then picked the gun up and fired it once, striking Wynn in the head.

At the time of her arrest, Diaz had visible bruising on her legs. According to Diaz, Wynn did not make any verbal threats prior to hitting her legs with the butt of the firearm. Further, Marsolais testified that Diaz told him while Wynn had hit Diaz in the past, in the days leading up to the shooting he had not been physically abusive. Diaz told Marsolais that "she knew it was a bad decision, but she was just tired. She didn't deserve to be hit. And that was her reasoning for it." Diaz did not tell Marsolais that she was in fear of her life or that she feared serious injury at the time she shot Wynn. Diaz also claimed that she had told someone named John Edwards and someone named "J.B." that Wynn had abused her in the past, but the police were not able to locate either.

Diaz told Marsolais that she went back to her home on Wednesday night and returned to the hotel on Thursday. She claimed that she wrapped up Wynn's body by herself, using sheets, garbage bags, and blankets that were in the hotel room or that she obtained from housekeeping staff, as well as some gloves and duct tape from her car. Diaz said she spent the entire day Thursday wrapping up Wynn's corpse and putting it in the corner of the hotel room. She then called Durrell Short, who came over to the hotel room after Wynn's corpse was wrapped up and on the floor. Another man came with Short, but left shortly thereafter. Short and Diaz smoked marijuana and had sex on the bed in the hotel room.

Marsolais also asked Diaz about posts made to Wynn's Facebook account starting on February 7. Initially, Diaz said that someone else must have had Wynn's phone, but she then admitted that she had made posts on his Facebook account and then started responding from her Facebook account to make it appear that they were having a conversation. Marsolais also asked Diaz about the gun she used to shoot Wynn. She said it was a revolver with a pink handle. Diaz initially said that she threw the gun off of the Chesapeake Bay Bridge Tunnel. However, she later told Marsolais that that was a lie. She then told Marsolais that she had sold the gun to another person for $100.

## II. Pre-Trial Motion

Prior to trial, the Commonwealth filed a motion *in limine* to redact portions of Diaz's police interrogation. Specifically, the Commonwealth sought to expunge any reference to Wynn's probation status for his drug offenses, and further sought to restrict Diaz from testifying to as much. Diaz opposed the motion on the ground that these redactions would violate the doctrine of completeness and fundamental fairness. Diaz proffered that during the interrogation, she told Marsolais that Wynn "jumped probation" three months before the shooting and that was when things got "really bad." Specifically, she noted that Wynn told her "he wasn't going back to jail." At the hearing for the motion *in limine*, Diaz argued that her statements were necessary to provide context as to when and why her relationship with Wynn began to become abusive, and also why she was apprehensive about calling the police. The trial court found that the portions of the interrogation identified by the Commonwealth were impermissible character evidence and granted the motion. The trial court further held that Diaz would not be allowed to testify about Wynn's probation status.

*III. The Trial*

At trial, the Commonwealth called numerous witnesses, including Williams, Johnson, Kwade, and Marsolais. Williams, Johnson, and Kwade all affirmed the sequence of events that took place during the week that Diaz and Wynn were checked into the hotel. Marsolais detailed the extent of his investigation at the hotel, the subsequent investigation conducted at Diaz's house, the discovery of the body found in Diaz's car, and the statements Diaz made to him during her interrogation. Marsolais testified that Diaz admitted that she had shot Wynn and that she had attempted to conceal the body because she did not know what to do. The recording of the interrogation was played at trial and admitted into evidence. Further, Marsolais described questioning Diaz about the Facebook posts made to Wynn's Facebook account.

Marsolais testified that he had reviewed Wynn's Facebook posts before questioning Diaz and that he had shown her the posts in question. Marsolais "showed her some text strings [between Wynn's Facebook account and her Facebook account] that started on the 7th." After pressing her, Marsolais testified that she admitted to sending the messages from both accounts, so as to "make it look like a conversation was happening between the two." Marsolais testified that she positively identified the account and posts he showed her on Wynn's account. On cross-examination, he admitted that it took him about five to ten minutes to read all of the messages at issue in their entirety, but that he never read the messages aloud to Diaz during the interrogation, and he only showed her the screen of his phone for "less than ten seconds." He further admitted that "she stated that she [made the] posts, but she never got to read the contents of the posts [herself]." The Commonwealth attempted to introduce screenshots of the aforementioned posts purportedly made from both Facebook accounts. Diaz objected on authenticity grounds, arguing specifically that "[t]here's nobody here from Facebook to authenticate that these messages were sent from where to whom, so there's nothing—there's no foundation laid as far as authentication." Diaz also objected

on the ground that the screenshots violated the best evidence rule. The trial court overruled the objection and allowed the screenshots of the Facebook posts into evidence.

After the Commonwealth rested, Diaz moved to strike the evidence against her on the charges of second-degree murder and defiling a dead human body. The trial court denied those motions. Subsequently, Diaz put on her own evidence in defense. Diaz testified on her own behalf, and also called Gerald Livermore as a defense witness. Diaz reaffirmed much of the statements that Marsolais attributed to her during her police interrogation. She testified that she and Wynn checked into the Red Roof Inn in early February. She testified that Wynn immediately began using cocaine. She testified that Wynn had been physically violent towards her in the past. She testified that Wynn had a reputation for using cocaine and that he would become violent, abusive, and "aggressive" when he used cocaine. And she testified that Wynn was a member of the Bloods gang.

Diaz described how the abuse in their relationship developed over time. She testified that Wynn was not abusive "in the beginning," but that after he moved in with her, the physical and emotional abuse started. This included such behavior as Wynn "grab[bing her] hair" and "verbally [abusing her] in front of [her] family." Later, the abuse grew more intense; Wynn began hitting Diaz on the legs, and once struck her in the face. Diaz testified that she did not report the abuse to the police because she was scared that Wynn's "gang affiliate[s]" would seek "retaliation" against her, her father, and her daughter. She also testified that she did not leave the relationship because, when she threatened to do so, in response Wynn threatened that he would "hurt" or "kill" her.

Diaz then went on to describe their stay at the Red Roof Inn. Diaz testified that Wynn was using approximately $250 worth of cocaine each day. She described Wynn's demeanor as "aggressive and mad," and stated that Wynn would "curse a lot" and that he "g[o]t physical" with her. He would grab Diaz's hair a lot, and hit her on the legs frequently. On the day in question, Wynn attempted to buy cocaine from a local seller, but the seller did not bring him the cocaine he

- 8 -

had purportedly purchased. Wynn became angry. Diaz testified that he began walking around with his gun in his hand, just "grunting and walking around." Wynn then physically assaulted her by striking her legs with the butt of the gun. She did not "understand" why he hit her because she had not "do[ne] anything." Diaz then testified that Wynn placed the gun down and that she then picked it up and shot him.

When asked "what was going through [her] mind when [she] shot him," Diaz testified that she "was scared." She elaborated that "[i]t was me or him" and that "[b]ecause he was very physical, [she] didn't know if he was going to continue to hurt [her]." Diaz also testified that Wynn had threatened to kill her "a few days prior" to the shooting.

Diaz testified that after she shot Wynn she was worried about retaliation, so she made the Facebook posts so that Wynn's "friends would think he was still alive and I wasn't in any danger for me and my kids." Diaz testified that she did not call the police because she was fearful of retaliation and that she had no plan of how to dispose of Wynn's body at the time. She testified that she did not "have a plan" as to what to do next and that she was not "thinking clearly." She wrapped the dead body in nearby items such as bed sheets, garbage bags, towels, and articles of clothing in order to conceal it. She then reached out to Durrell Short to help her take care of the body. Short came to her hotel room on either Friday or Saturday; the two of them smoked marijuana and had sex in the bathroom. Short stayed with Diaz in the hotel room that night, and the next day they moved the body into Diaz's vehicle, with the help of Williams and Johnson. Diaz told Williams and Johnson that they were moving a grandfather clock. Diaz then drove home. The next day, the police arrived at her home.

On cross-examination, Diaz admitted that, during her interrogation with Marsolais she had twice denied that Wynn had ever hit her in the face. The Commonwealth also confronted her with two jail calls that Diaz made on February 27, 2020, during which she told her daughter and a friend

that she shot Wynn because he had struck her in the mouth with the gun so hard that he shattered her teeth. The Commonwealth proffered the contents of the call to the friend, asking Diaz on cross-examination:

> Didn't you claim to her that specifically involving this incident from February 5th of 2020, that your face was swollen because he knocked my teeth out, and she asked, How many of them? And you said, "He knocked three out on my right side. He hit me so hard, Bitch, with that gun, he knocked my fucking teeth out. My shit was hella fucking swollen. I was losing weight because that n-i-g-g-a was stressing me, man."

The Commonwealth also proffered the content of the call to the daughter: "He was hitting me so bad and he knocked my teeth out in the hotel and he had hit me with the gun, and I picked it up and I just shot him with it." Both calls were played for the jury. Diaz ultimately confirmed the statements that she made during the two calls; however, she claimed that when she referred to Wynn striking her in the face, she was talking about a previous incident between the two, not the leadup to the shooting in the hotel room.

Diaz also admitted on cross-examination that, although she had testified on direct that she did not leave Wynn because he threatened to kill her, she had told Marsolais during her interrogation that she did not leave Wynn because she did not "want to be alone." Diaz also admitted that she told Marsolais during the interrogation that she was "tired," she "didn't deserve to get hit," that she was "fed up because he had previously hit" her, and that she made a "bad decision."

Livermore testified on Diaz's behalf. He testified that he became friends and neighbors with Wynn in 2018. Both were affiliated with the Bloods gang. Specifically, Wynn was a member of the Bounty Hunter sect of the Bloods before he became a member of the G-Shine Bloods sect. Livermore testified that Wynn was "an aggressive person, somebody you didn't really want to mess with or piss off." Wynn was respected and feared within the Bloods gang. Livermore testified that

when Wynn said "he was going to do something, he normally [did] it." Livermore also testified to specific acts of violence that he witnessed Wynn commit. On one occasion Livermore witnessed Wynn "pulverize[]" Livermore's roommate over a dispute for money. He testified that Wynn was the physical aggressor and Livermore had to stop the assault. On another occasion Livermore witnessed Wynn physically and violently assault another roommate after Wynn took umbrage with something that the roommate said. Livermore testified that Wynn called one of his Bloods-affiliated friends to come over and "handle the business." The roommate was "pulverized" by Wynn and the gang-affiliated friend, and ultimately required hospitalization due to injuries suffered from the assault.

The Commonwealth did not put on any rebuttal evidence, and Diaz moved to strike the evidence against her once again. The trial court denied Diaz's motion, and the case was submitted to the jury. The jury found Diaz guilty on all charges. Diaz appeals.

ANALYSIS

*I. Evidentiary Issues*

A trial court's decision on the admissibility of evidence is reviewed for abuse of discretion. *Jackson v. Jackson*, 69 Va. App. 243, 247 (2018), *aff'd*, 298 Va. 132 (2019). An abuse of discretion occurs "when a relevant factor that should have been given significant weight is not considered" or "when an irrelevant or improper factor is considered and given significant weight." *Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011) (quoting *Kern v. TXO Production Corp.*, 738 F.2d 968, 970 (8th Cir. 1984)). The court also abuses its discretion when it commits a clear error of judgment, even if considering "all proper factors, and no improper ones." *Id.* (quoting *Kern*, 738 F.2d at 970). "In evaluating whether a trial court abused its discretion, . . . '[this Court does] not substitute [its] judgment for that of the trial court. Rather, [this Court] consider[s] only whether the record fairly supports the trial

- 11 -

court's action.'" *Carter v. Commonwealth*, 293 Va. 537, 543 (2017) (alteration in original) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

"The abuse-of-discretion standard [also] includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id.* at 543-44 (alteration in original) (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Lambert v. Commonwealth*, 70 Va. App. 740, 749 (2019) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)). "That standard means that the [trial] court judge's ruling 'will not be reversed simply because an appellate court disagrees.'" *Fields v. Commonwealth*, 73 Va. App. 652, 672 (2021) (quoting *Thomas*, 44 Va. App. at 753). In conducting this analysis, this Court views "the evidence in the light 'most favorable to the Commonwealth as the prevailing party on this issue in the [trial] court.'" *Id.* (quoting *Grattan*, 278 Va. at 617).

*A. The Commonwealth's Motion in Limine and Diaz's Related Testimony*[2]

In her first two assignments of error, Diaz makes three arguments challenging the trial court's decision to redact the recording of her interrogation and in restricting her from testifying about Wynn's probation status. First, she argues that the doctrine of completeness required that the full recording be admitted into evidence. Second, she argues that fundamental fairness—as applicable through the due process clause of the Fourteenth Amendment—required that the full recording be admitted into evidence. And third, she argues that Wynn's status as a probationer and drug dealer was relevant and probative to her defense and was not impermissible character evidence. Even assuming the trial court erred in excluding the evidence at issue, any such error was harmless.

A non-constitutional error is harmless "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." *Salahuddin v. Commonwealth*, 67 Va. App. 190, 212 (2017)

---

[2] The Commonwealth claims on appeal that "Diaz's proffer of the redacted portion of the [interrogation was] so unclear as to defeat meaningful appellate review." This contention is belied by the record, as Diaz's counsel sufficiently proffered the contents of the redacted portions of the recording at the pre-trial hearing, and the trial court expressed an understanding of what was at issue. After Diaz's proffer, and accompanying argument regarding Wynn's status as a probationer and his past as a drug dealer, the trial court, in speaking to the Commonwealth's Attorney, stated:

> I didn't see anything from the defense indicating that what you
> were saying was untrue, meaning the parts that you cut out were
> the parts where she mentioned that he's a drug dealer, he's on
> probation. If you've cut out, to use your example, to push it to the
> absurd, everything except where she says, I shot him, then,
> obviously, you're not on solid ground if that's what you did. But
> I'm not gathering that that's what you did.

Then, in speaking to counsel for Diaz, the trial court asked, "Would you concede that the parts that were cut out were references to the victim being on probation and being a drug dealer?" To which counsel for Diaz responded "Yeah." Therefore, it is clear that the proffer made by Diaz was not vague or ambiguous, and the trial court fully understood the nature and extent of the evidence it ultimately excluded.

(alteration in original) (quoting Code § 8.01-678). "The proper inquiry for constitutional harmless error is 'whether the [factfinder] would have returned the same verdict absent the error.'" *Commonwealth v. White*, 293 Va. 411, 421-22 (2017) (alteration in original) (quoting *Washington v. Recuenco*, 548 U.S. 212, 221 (2006)). "[W]hether such an error is harmless in a particular case depends upon a host of factors," including the "importance of the [tainted evidence] in the . . . case, whether [that evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [tainted evidence] on material points . . . and . . . the overall strength of the prosecution's case." *Crawford v. Commonwealth*, 281 Va. 84, 101 (2011) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

First, we analyze the probative value of the evidence at issue. Here, Diaz proffered that her statements during the interrogation would have been that Wynn was on probation for criminal offenses related to the sale of illegal drugs, that he "jumped probation," and that he became more abusive, violent, and aggressive after doing so. Diaz argues on brief that this evidence was relevant in two ways: (1) it provided context for *why* Diaz chose not to call the police, and (2) it was another factor that added to Diaz's "reasonable belief" that she was in danger of imminent physical harm just before she shot and killed Wynn.

Diaz argues that the evidence of Wynn's status as a probationer was not intended to attack Wynn's character, which would contravene Rule of Evidence 2:404.[3] Instead, Diaz's theory of why the evidence is probative is something more. According to Diaz, the evidence was

---

[3] "Evidence of a person's character or character trait is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except . . . evidence of a pertinent character trait or acts of violence by the victim of the crime offered by an accused who has adduced evidence of self defense." Va. R. Evid. 2:404(a)(2). This is because, "evidence of prior acts of violence by the victim is relevant" in cases where the defendant has adduced evidence of self-defense, "as bearing on the reasonable apprehension which the defendant may have experienced and on the likelihood of the victim's aggressive behavior as claimed by the defendant." *Edwards v. Commonwealth*, 10 Va. App. 140, 142 (1990) (citing *Barnes v. Commonwealth*, 214 Va. 24, 26 (1973)).

not offered to simply highlight Wynn's status as a probationer and former convict. The evidence that Wynn was on probation, and then "jumped" or violated his probation, was offered to explain that thereafter, Wynn began acting more aggressive and said things like "I'm not going back to jail," making Diaz think that he was willing to take more drastic and violent action to avoid going back to jail. Diaz describes this as Wynn's "fatalistic" mindset.

According to Diaz, Wynn's fatalistic statements and mindset contributed to Diaz's belief that she was unable to leave the relationship for fear that Wynn would take violent action against her and her family. She offered this evidence to explain why she did not leave the hotel room during the week leading up to the shooting. This fact was material, according to Diaz, because the theory of the Commonwealth's case was that Diaz *chose* to stay in the relationship, *chose* to stay with Wynn in the hotel room during that week, and *chose* to pick up the gun and murder Wynn in a moment of anger.

Even if we accept Diaz's theory of why the evidence was relevant, it was only relevant to explain her trepidation in contacting the police before she shot Wynn. After the fact, it goes without saying that Wynn would not have presented any sort of a physical threat to her, and therefore the fact that he had absconded from probation, and consequently may have been likely to engage in more desperate and aggressive behavior would no longer be relevant.

In evaluating the proffered evidence, we note that Diaz was allowed to present evidence that Wynn was a gang member, had threatened her multiple times, had been physically abusive with her, that she believed she could not leave the relationship, and that she was scared to call the police. Specifically, when asked why she never called the police to report the abuse, Diaz responded: "I was scared because of his street ties. A lot of people would come over. They knew where me and my family lived." While the trial court may have erred by not allowing Diaz to provide an additional reason for why she was scared to call the police, thus bolstering her

evidence, the ultimate reason for introducing any such evidence was to make the point that she was ultimately allowed to testify to. This, in the face of the overwhelming evidence that the Commonwealth put on, leads us to conclude, beyond a reasonable doubt, that the verdict would have been the same even should the evidence at issue have been introduced. *See Schwartz v. Schwartz*, 46 Va. App. 145, 159 (2005) ("[I]f other evidence of guilt is so 'overwhelming' and the error so insignificant by comparison . . . we can conclude that the error 'failed to have any "substantial influence" on the verdict[, and was therefore harmless].'" (quoting *United States v. Lane*, 474 U.S. 438, 450 (1986))).

Therefore, taking into consideration all the evidence that Diaz was allowed to offer, including (1) Wynn's prior violent and abusive acts towards her; (2) his reputation for violence in the community; (3) his membership in a gang and his status as an enforcer in that gang; (4) her fear of Wynn; (5) her fear of Wynn's gang affiliates; (6) the fact that the abuse from Wynn escalated as the relationship progressed; (7) the fact that Wynn was using copious amounts of cocaine during their stay at the hotel and that his demeanor was even more violent and aggressive because of his drug use; (8) the fact that he struck her in the legs right before she shot him; and (9) the fact that she was allowed to testify to her feeling that it "was either him or me" in that moment, we cannot say that Diaz did not have a fair trial on the merits here. We conclude that the result would not have been different had the trial court admitted the evidence at issue, as it was inconsequential when contrasted with the evidence she *was* allowed to introduce, as well as the overwhelming weight of the Commonwealth's evidence.[4] Therefore, any such error in excluding the evidence at issue was harmless.

---

[4] We come to this conclusion noting that the trial court also expressed doubt about the actual relevance or probative value of the evidence at issue here and that the evidence would likely have been unfairly prejudicial to the Commonwealth's case. We agree with the trial court that "[t]he fact that [Wynn] was generally a bad guy and was a potential drug dealer or had been using drugs" is not probative of any sort of violent tendencies. This is the type of evidence that

### B. The Facebook Posts

Diaz next challenges the trial court's decision to allow the screenshots of the Facebook posts from Wynn's account. Diaz contends that the trial court abused its discretion in admitting the screenshots because they were not properly authenticated and because they violated the best evidence rule. However, as the Commonwealth points out, the screenshots are "duplicate originals" for purposes of the best evidence rule, and both Diaz and Marsolais properly authenticated the screenshots.

> The "best evidence rule," which made its appearance in the English law in the early part of the eighteenth century, was not originally a "rule," but rather "a general observation to the effect that when one sets out to prove something, one ought to prove it by the most reliable evidence available."

*Dalton v. Commonwealth*, 64 Va. App. 512, 521 (2015) (quoting Charles E. Friend, Kent Sinclair, *The Law of Evidence in Virginia* § 18-1 (7th ed. 2012)). "[T]he best evidence rule requires that where the contents of a writing are desired to be proved, the [original] writing itself must be produced or its absence sufficiently accounted for before other evidence of its contents can be admitted." *Id.* at 522 (quoting *Brown v. Commonwealth*, 54 Va. App. 107, 115 (2009)). This Court determined in *Dalton* that text messages on a cell phone constitute "writings" for purposes of the best evidence rule. *See id.* at 523. Writings include words "set down by . . . photographing . . . mechanical or electronic recording, or other form of data compilation or preservation." *Id.* at 522; Va. R. Evid. 2:1001(1). In coming to this conclusion, the Court in *Dalton* acknowledged that "[t]he potentially limitless application of computer technology to evidentiary questions will continually require legal adaptation." 64 Va. App. at 522-23 (quoting

---

*Luck v. Commonwealth*, 30 Va. App. 36 (1999), establishes is inadmissible to prove violent tendencies or prior violent acts, under Rule 2:404. *See id.* at 43-46 (holding that evidence of a prior criminal conviction, alone, is not admissible if the "bare conviction order" does not evince the victim's "prior violent or turbulent behavior").

*Penny v. Commonwealth*, 6 Va. App. 494, 499 (1988)). We think the same rationale espoused in *Dalton* applies here and that the best evidence rule applies to Facebook posts, as they are clearly "writings" within the scope of the rule. However, that is not the end of our analysis.

Virginia appellate courts have applied the concept of "duplicate originals" to mechanically reproduced copies of writings. *See, e.g.*, *Burton v. Frank A. Seifert Plastic Relief Co.*, 108 Va. 338, 352-53 (1908) (applying the duplicate original principle to "letter-press copies"); *Chesapeake & Ohio Ry. Co. v. F.W. Stock & Sons*, 104 Va. 97, 101 (1905) (recognizing that a "carbon copy" may be regarded as a "duplicate original"). A duplicate original is "'made at the same time,' 'by the same [mechanical] impression,' and each is an 'exact counterpart of the other.'" *Winston v. Commonwealth*, 16 Va. App. 901, 904 (1993) (alteration in original) (quoting *F.W. Stock & Sons*, 104 Va. at 101). It is "accorded the same dignity as an original and, 'if otherwise proper,' similarly 'admissible in evidence.'" *Id.* (quoting *Virginia-Carolina Chem. Co. v. Knight*, 106 Va. 674, 679 (1907)). Under this view, "[m]any of the documents that we commonly refer to as 'copies' are in fact 'duplicate originals,' and are treated as 'originals' for purposes of the best evidence rule." Kent Sinclair, *The Law of Evidence in Virginia* § 18-4[a], at 1267-68 (8th ed. 2018). "[A]pplication of the best evidence rule is unnecessary" when the admitted evidence qualifies as an original. *Winston*, 16 Va. App. at 904.

In a recent unpublished case, this Court applied the concept of duplicate originals to screenshots of text messages, reasoning that the act of screenshotting a text message on the screen of a cell phone "is no different than photocopying or 'carbon copying' the cell phone screen." *Newberger v. Commonwealth*, No. 0677-22-2, slip op. at 15, 2023 WL 4187885, at *8 (Va. Ct. App. June 27, 2023). "While Rule 5A:1(f) provides that unpublished opinions may be cited as informative, 'unpublished opinions are merely persuasive authority and not binding precedent.'" *Coffman v. Commonwealth*, 67 Va. App. 163, 172 n.7 (2017) (quoting *Baker v.*

- 18 -

*Commonwealth*, 59 Va. App. 146, 153 n.3 (2011)).  With that being said, we endorse the

rationale contained in *Newberger* and apply it with equal force to the screenshots of the

Facebook posts at issue here.  Therefore, the screenshots qualify as duplicate originals for

purposes of the best evidence rule.

Next, to the extent that Diaz argues that the screenshots were not properly authenticated,

we disagree.  Rule of Evidence 2:901 provides that "[t]he requirement of authentication or

identification as a condition precedent to admissibility is satisfied by evidence sufficient to

support a finding that the thing in question is what its proponent claims."  Marsolais testified that

Diaz recognized the posts and admitted that she had surreptitiously posted the messages, herself,

from Wynn's account in an attempt to make it seem like he was still alive.  This is sufficient to

satisfy the authentication requirements contained in Rule 2:901.[5]  Therefore, the evidence was

properly admitted.

## II.  Sufficiency of the Evidence

In challenging the trial court's denial of her motions to strike the second-degree murder

charge and the physically defiling a dead body charge, Diaz necessarily asserts that the jury should

not have been allowed to even consider the charges because "[a] motion to strike challenges

whether the evidence is sufficient to submit the case to the jury."  *Linnon v. Commonwealth*, 287

Va. 92, 98 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013)).  As a result, her

challenge raises the question of whether the evidence adduced sufficiently presented "a *prima facie*

---

[5] To the extent that Diaz argues she "only had a few seconds to generally view the posts" and that it may have been possible that the posts were not the same as those she admitted to making or were somehow altered in some way before being introduced as part of the Commonwealth's case in chief, we reiterate that this "mere speculation" goes to the weight of the evidence, not its admissibility. *See Reedy v. Commonwealth*, 9 Va. App. 386, 391 (1990) ("Where there is mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight to be given the evidence.").

- 19 -

case [of second-degree murder and of physically defiling a dead body] for consideration by the" jury. *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 657 (2015)).

As our Supreme Court reaffirmed in *Linnon*:

> What the elements of the offense are is a question of law that we review de novo. Whether the evidence adduced is sufficient to prove each of those elements is a factual finding, which will not be set aside on appeal unless it is plainly wrong. In reviewing that factual finding, we consider the evidence in the light most favorable to the Commonwealth and give it the benefit of all reasonable inferences fairly deducible therefrom. After so viewing the evidence, the question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In sum, if there is evidence to support the conviction, the reviewing court is not permitted to substitute its judgment, even if its view of the evidence might differ from the conclusions reached by the finder of fact at the trial.

287 Va. at 98 (quoting *Lawlor*, 285 Va. at 223-24).

### A. Second-Degree Murder

Diaz argues on appeal that the Commonwealth's evidence was insufficient to prove that she acted with malice. Diaz argues that "[a]ll of the evidence supports that [Diaz] acted in the heat of passion." We disagree.

"Second-degree murder, of which the jury convicted appellant, is defined as a malicious killing." *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016) (citing *Turner v. Commonwealth*, 23 Va. App. 270, 274 (1996), *aff'd*, 255 Va. 1 (1997)). "In order for an act to be done maliciously, the act must be done 'wilfully or purposefully.'" *Id.* (quoting *Essex v. Commonwealth*, 228 Va. 273, 280 (1984)). "Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great provocation." *Id.* (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992)). "Voluntary manslaughter is the unlawful killing of another, 'committed in the

course of a sudden quarrel, or mutual combat, or upon a sudden provocation, and without any previous grudge, and the killing is from the sudden heat of passion growing solely out of the quarrel, or combat, or provocation.'" *Id.* (quoting *Wilkins v. Commonwealth*, 176 Va. 580, 583 (1940)). "'Heat of passion refers to the furor brevis which renders a man deaf to the voice of reason.' 'It excludes malice when provocation reasonably produces fear or anger that causes one to act on impulse without conscious reflection.'" *Id.* (quoting *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003)). "Malice and heat of passion cannot coexist." *Id.* (quoting *Turner*, 23 Va. App. at 275). "As a general rule, whether provocation, shown by credible evidence, is sufficient to engender the furor brevis necessary to rebut the presumption of malice arising from a homicide is a question of fact." *Id.* at 131-32 (quoting *McClung v. Commonwealth*, 215 Va. 654, 656 (1975)).

Here, Diaz argues that, because she was "stuck" in the hotel room with Wynn, and because Wynn "pistol whipped her with his gun," the evidence "support[ed] the fact that [Diaz] did not act with a deliberate mind." Further, the fact that Diaz "had no plan to dispose of the body and improvised by wrapping the body with nearby items in the hotel," also supports this contention, according to Diaz. Diaz argues that because the facts are uncontroverted and the Commonwealth did not introduce any evidence to contradict Diaz's testimony about what happened, we must reverse.

The Commonwealth points out that whether malice exists is a question of fact, and "[i]n convicting Diaz of second-degree murder, the jury expressly found that she acted with malice and not under the heat of passion." We agree with the Commonwealth that we are bound by this factual finding, "unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it." *Wood v. Commonwealth*, 57 Va. App. 286, 292 (2010) (quoting

- 21 -

*Martin v. Commonwealth*, 4 Va. App. 438, 443 (1987)).  And there was clearly ample evidence to support the jury's finding of malice, here.

The record demonstrates that Diaz had her car with her at the hotel, and could have left, should she have wished to do so; however, Diaz stayed with Wynn at the hotel, and deliberately picked up the gun and shot Wynn in the head.  Further, Diaz's testimony was unclear as to what her state of mind was when she shot Wynn.  The jury was not obligated to credit any indication Diaz may have given of her feelings of fear or rage.  *See Commonwealth v. McNeal*, 282 Va. 16, 22 (2011) ("[A] fact finder's evaluations of credibility are not limited to choosing between competing accounts offered by different witnesses, but often include . . . resolving conflicts in a single witness' testimony, accepting that part of the testimony it deems credible and rejecting the portion it deems incredible." (internal citations omitted)); *see also Barrett v. Commonwealth*, 231 Va. 102, 107 (1986) (recognizing that the finder of fact has "the right to reject that part of the evidence believed . . . to be untrue and to accept that found . . . to be true" (quoting *Belton v. Commonwealth*, 200 Va. 5, 9 (1958))).  Instead, the jury "was at liberty to discount [the defendant's] self-serving statements as little more than lying to conceal [her] guilt."  *Poole v. Commonwealth*, 73 Va. App. 357, 369 (2021) (quoting *Becker v. Commonwealth*, 64 Va. App. 481, 495 (2015)).  Further, "[m]alice may be inferred 'from the deliberate use of a deadly weapon unless, from all the evidence,' there is reasonable doubt as to whether malice existed."  *Washington v. Commonwealth*, 75 Va. App. 606, 621 (2022) (quoting *Avent v. Commonwealth*, 279 Va. 175, 201-02 (2010)).  Here, we cannot say that the trial court was plainly wrong in determining that the Commonwealth had presented sufficient evidence of malice, and thereafter submitting the case to the jury on that issue.

## B. Defiling a Dead Body

Code § 18.2-126(B) states that a person who "willfully and intentionally physically defiles a dead human body" is guilty of a Class 6 felony. Diaz argues that there was insufficient evidence to support her conviction of defiling a human body, under Code § 18.2-126(B), because the evidence showed that Wynn's body was not disfigured beyond ordinary decomposition. Specifically, she notes that:

> [T]he medical examined [sic] confirmed there was no evidence that Wynn's body was disfigured at all after Wynn's death beyond normal, expected body decomposition. The body was not left outside in the elements. It remained in the hotel room with Appellant until she moved it to her vehicle three days later where it remained secured until recovery by law enforcement.

Diaz contrasts this case with our Court's previous unpublished opinion in *Everett v. Commonwealth*, No. 1679-18-1, 2020 WL 1855837 (Va. Ct. App. Apr. 14, 2020). In *Everett*, the defendant "dumped [the victim's] body in a garbage-strewn and filthy park, leaving it at the mercy of marauding animals that ultimately gnawed off part of her body." *Id.*, slip op. at 9, 2020 WL 1855837, at *5. The victim's body in *Everett* was not found until more than a month later. *Id.* at 2-3, 2020 WL 1855837, at *1. This Court specifically noted that the defendant "purposely left her body in an area where harm to the sanctity of the body was foreseeable and, in fact, ultimately caused such severe disfigurement to her body that dental records were needed to identify it." *Id.* at 9-10, 2020 WL 1855837, at *5. Inherent in Diaz's argument is the contention that Code § 18.2-126(B) does not contemplate conduct that does not result in some sort of *physical* damage or disfigurement to the body.

The Commonwealth resists Diaz's argument, arguing that Diaz's interpretation of the statute "adds limitations to the statute that the General Assembly did not see fit to include." Instead, the Commonwealth argues that the General Assembly chose to use a broader term— "defile"—which this Court in *Everett* interpreted to include "dishonor or disrespect of a body."

While the Commonwealth acknowledges that the term "physically" modifies the term "defile" in the statute, the Commonwealth maintains that this does not require physical *damage* to the body. Instead, the Commonwealth argues that there simply has to be some sort of physical nexus between the defendant's act of defilement and the body.

Here, the Commonwealth points to two facts which it believes are sufficient to support the conviction: (1) the fact that Diaz engaged in sexual activity "just feet away from Wynn's dead body," which, according to the Commonwealth, "indicated disdain and disrespect" for the body; and (2) the fact that Diaz wrapped the body "in various refuse [including] trash bags, . . . dumped the body in her car, [and threw] the moving dolly on top of it."

Resolving this issue requires us to interpret the outer limits of Code § 18.2-126(B). This is a question of statutory interpretation requiring de novo review. *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014). Where statutory construction is necessary, an appellate court construes a statute to "'ascertain and give effect to the intention' of the General Assembly." *Farhoumand v. Commonwealth*, 288 Va. 338, 343 (2014) (quoting *Rutter v. Oakwood Living Ctrs. of Va. Inc.*, 282 Va. 4, 9 (2011)). Penal statutes must be "strictly construed against the Commonwealth," but "[a] defendant is not 'entitled to a favorable result based upon an unreasonably restrictive interpretation of [a] statute.'" *Grimes v. Commonwealth*, 288 Va. 314, 318 (2014) (quoting *Ansell v. Commonwealth*, 219 Va. 759, 761 (1979)). In conducting this analysis, we are inclined to agree with the Commonwealth, as the statute by its plain language does not require some sort of physical "damage" or "disfigurement."

As noted above, the statute expressly requires that a perpetrator "*physically* defile[] a dead human body." Code § 18.2-126(B) (emphasis added). This Court in *Everett* defined "defile" as referring to "acts that disrespect, dishonor, or desecrate a dead body." *Everett*, slip

op. at 6-7, 2020 WL 1855837, at \*3-4.[6] The word "physical" modifies the verb "defile[]" in the statute. "Physical" amongst various definitions, means: "of or relating to natural or material things as opposed to things mental, moral, [or] spiritual," and "of or relating to the body[,] . . . often [as] opposed to mental." *Physical*, *Webster's Third New International Dictionary* (1993) (emphasis omitted). "[W]e give the term ['physical'] its ordinary and plain meaning, considering the context in which it was used." *Grimes*, 288 Va. at 318. We agree with Diaz that the statute requires that the dishonor, disrespect, or desecration must manifest in some physical way. However, the statute does not require that this physical manifestation cause any physical "damage," as argued by Diaz. Adopting such an interpretation would add language to the statute that does not exist. *See Baker v. Commonwealth*, 278 Va. 656, 660 (2009) ("When the language of a statute is unambiguous, courts are bound by the plain meaning of that language and may not assign a construction that amounts to holding that the General Assembly did not mean what it actually has stated." (quoting *Elliott v. Commonwealth*, 277 Va. 457, 463 (2009))); *see also Washington v. Commonwealth*, 272 Va. 449, 459 (2006) ("Courts cannot 'add language to the statute the General Assembly has not seen fit to include.'" (quoting *Holsapple v. Commonwealth*, 266 Va. 593, 599 (2003))). Instead, the plain language of the statute proscribes physical interaction with a dead human body in a way that dishonors, disrespects, or desecrates it.

Here, after shooting Wynn, Diaz placed his dead body on an ironing board and wrapped it in seven layers of various materials, including trash bags that were packed around the corpse's head. She then conscripted the unwitting aid of Williams and Johnson in attempting to secret the body away from the hotel so that she could unlawfully dispose of it without alerting the

---

[6] As noted earlier, "[w]hile Rule 5A:1(f) provides that unpublished opinions may be cited as informative, 'unpublished opinions are merely persuasive authority and not binding precedent.'" *Coffman*, 67 Va. App. at 172 n.7 (quoting *Baker*, 59 Va. App. at 153 n.3). Nevertheless, we endorse the statutory analysis conducted by the *Everett* Court in defining the term "defile," as used in Code § 18.2-126(B).

- 25 -

authorities.[7]  In doing so, she told Williams and Johnson that Wynn's body was a grandfather clock, whereafter both Williams and Johnson attempted to help move the body into the trunk of Diaz's car *under the guise that the body was merely a piece of furniture and could be treated as such*.  Then later when the police found the body, the moving dolly was lying on top of it in the back of the car.  Diaz's physical actions with regard to Wynn's corpse—including putting it on an ironing board, wrapping it with miscellaneous items including trash bags, enlisting the aid of people who believed they were moving a piece of furniture, packing it into the back of a crowded car, and putting a dolly on top of it—did not comport with the typical respect and reverence with which our society ordinarily treats dead bodies.  As noted in *Everett*, "[t]he legislative intent of Code § 18.2-126 is to protect the sanctity of both a burial place and a dead body, wherever situated."  *Everett*, slip op. at 6, 2020 WL 1855837, at *3.  Were we to adopt Diaz's preferred interpretation, we would frustrate this legislative aim.  The jury was therefore entitled to find, based on the facts presented, that the evidence proved Diaz physically treated the victim's body with disrespect and dishonor as prohibited by the statute.[8]  *See generally, e.g.*, *Gerald v. Commonwealth*, 295 Va. 469, 479 (2018) (providing that on review of a challenge to the sufficiency of the evidence, the appellate court "does not ask *itself* whether *it* believes the evidence establishes the essential elements of the crime beyond a reasonable doubt, but whether

---

[7] The fact that Diaz may have acted with an intent to conceal the body and escape detection does not prevent a finding that she also had the necessary intent to physically defile Wynn's body.  *See, e.g.*, *Eberhardt v. Commonwealth*, 74 Va. App. 23, 38-39 (2021) (recognizing that "a defendant may act with more than one intent" and "a specific criminal intent may coexist with a less culpable intent" (first citing *Green v. Commonwealth*, 72 Va. App. 111, 119-20 (2012); and then citing *Moody v. Commonwealth*, 28 Va. App. 702, 707-08 (1998))).

[8] In coming to this conclusion, we acknowledge and agree with the dissent's contention that the fact that Diaz had sexual relations near the dead body "involved no contact with Wynn's body and [therefore] cannot be sufficient to demonstrate that she 'physically defile[d]' the body." (second alteration in original).  Our holding regarding the sufficiency of the evidence is based entirely on the facts surrounding Diaz's *physical* treatment of the body.

*any rational trier of fact* could have so found").  The trial court therefore did not err in submitting the defiling charge to the jury.

## CONCLUSION

Neither of the two evidentiary issues raised by Diaz are meritorious.  Further, the evidence was sufficient to support Diaz's convictions for second-degree murder, as well as defiling a dead human body.  Accordingly, we affirm the trial court's decision.

*Affirmed.*

Ortiz, J., concurring in part, and dissenting in part.

I join with the majority's opinion as to all but Part II.B., which relates to the sufficiency of the evidence for Diaz's defilement conviction. As to the defilement conviction, I would hold that the trial court erred in denying her motion to strike as the Commonwealth failed to produce sufficient evidence of defilement as required by Code § 18.2-126(B).

As the majority correctly points out, while Diaz raises this as a sufficiency challenge, the real issue is one of statutory interpretation, which we review de novo. *See ante* at 24; *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014). Code § 18.2-126(B) penalizes the act of "willfully and intentionally physically defil[ing] a dead human body." The majority emphasizes that the Code contains no requirement that the body suffer "physical damage or disfigurement," and declines to read such a requirement into the statute. *Ante* at 24. I agree. I respectfully disagree, however, with the majority's holding that Diaz's physical actions here were sufficient to constitute defilement. *See ante* at 25-26.

Code § 18.2-126(B) does not define defilement, noting only an exception for "lawful purpose[s]" such as "autopsy or the recovery of organs or tissues for transplantation." Though "defile" is used elsewhere in the Code to mean sexual molestation, *see* Code § 18.2-48(ii); *Fitzgerald v. Commonwealth*, 223 Va. 615, 632-33 (1982); the legislative history of Code § 18.2-126 shows that the General Assembly changed the statutory language from "physically molests" to "physically defiles," suggesting a different definition here, *see* H.B. 1865 (1995) (as engrossed Feb. 7, 1995). Black's Law Dictionary defines "defile" as

> 1. To make dirty; to physically soil. 2. To make less pure and good, esp. by showing disrespect; to dishonor. 3. To make ceremonially unclean; to desecrate. 4. To morally corrupt (someone). 5. *Archaic*. To debauch (a person); to deprive (a person) of chastity.

*Defile*, *Black's Law Dictionary* (11th ed. 2019). As noted by a panel of this Court in the unpublished *Everett* opinion, the General Assembly likely intended to encompass "acts that disrespect, dishonor, or desecrate a dead body" and also acts "to disrespect, dishonor, make dirty or soil." *Everett v. Commonwealth*, No. 1679-18-1, slip op. at 7, 2020 WL 1855837, at \*4 (Va. Ct. App. Apr. 14, 2020). This definition aligns with the word "defile" in other code sections. *See* Code § 18.2-488 ("No person shall publicly burn with contempt, mutilate, deface, defile, trample upon, or wear with intent to defile any such flag, standard, color, ensign or shield."); Code § 3.2-901 ("The Commissioner [of Agriculture and Consumer Services] may provide technical assistance to persons for the suppression of any nuisance birds when it has been determined that they are defacing or defiling public or private property."). In both Code §§ 18.2-488 and 3.2-901, "defile" is used with other verbs that convey physical destruction, defacement, and violation. *See Loch Levan Land Ltd. P'ship v. Bd. of Supervisors*, 297 Va. 674, 685 (2019) ("[T]he meaning of doubtful words in a statute may be determined by reference to their association with related words and phrases." (quoting *Andrews v. Ring*, 266 Va. 311, 319 (2003))). Similarly, the General Assembly included in Code § 18.2-126(B) the important modifier that penalized acts of defilement be "physical."

Among several possible definitions, "physical" here likely means either (1) "[o]f, relating to, or involving material things; pertaining to real, tangible objects"; (2) "[o]f, relating to, or involving someone's body as opposed to mind"; or (3) "[o]f, relating to, or involving rough or violent contact." *Physical*, *Black's Law Dictionary*, *supra*. The majority correctly notes that "the statute requires that the dishonor, disrespect, or desecration must manifest in some physical way." *Ante* at 25. Yet their analysis proceeds to rely on Diaz's state of mind in transporting the body. *See ante* at 26 (noting Diaz's ruse in informing onlookers that the body was a grandfather clock and suggesting, without evidence, that this led the body to be treated with physical

disrespect).[9]  These actions, disconnected from "real, tangible objects" and not involving any form of "contact" with the body, cannot, as a matter of law, constitute "physical" defilement.[10]

The majority also points to the facts that Diaz placed the body on an ironing board, wrapped it with unused trash bags and other materials she had on hand, placed it in the back of her car next to other boxes, and placed a moving dolly on top of it.  *Ante* at 25-26.  While these actions are "physical," they do not signal disrespect or dishonor rising to the level of defilement.  Though, as the majority notes, the General Assembly intended "to protect the sanctity of both a burial place and a dead body," Diaz's physical actions toward the body did not demean the body's sanctity.  *See ante* at 26 (quoting *Everett*, slip op. at 6, 2020 WL 1855837, at *3).  Rather, Diaz used materials she had on hand to wrap the body.  She also placed the body in the back of her car, with other items she also needed to transport, when she returned to her home from the hotel.  There is no evidence that the body itself was treated with less than due care under the circumstances.  I do not believe the General Assembly intended the defilement statute to criminalize such a broad swath of behavior.  *See Turner v. Commonwealth*, 226 Va. 456, 459 (1983) (noting that penal statutes "must be strictly construed against the state and limited in application to cases falling clearly within the language of the statute").

---

[9] The majority also points out the Commonwealth's reliance on the fact that Diaz had sexual intercourse *near* the wrapped body.  *Ante* at 24.  While her sexual activity was clearly "physical," relating to her "body as opposed to [her] mind," it involved no contact with Wynn's body and cannot be sufficient to demonstrate that she "physically defile[d]" the body.

[10] Similarly, while I agree with much of the reasoning in this Court's unpublished opinion in *Everett*, I would also reject that panel's holding that the actions of the appellant in that case constituted "defilement."  *See Everett*, No. 1679-18-1, 2020 WL 1855837.  While the resulting damage to the dead body in *Everett* was gruesome, the Court could only point to the appellant's act in "dump[ing]" the corpse in a filthy public park, abandoning it to the elements.  Slip op. at 9, 2020 WL 1855837, at *5.  Such abandonment is more an omission than a "physical" act of defilement.  *See id.*

- 30 -

Diaz's actions in wrapping and moving the body allowed her to "conceal," "secrete," and "transport" the body away. *See* Code § 18.2-323.02. The legislature surely intended "defile" to mean something more than concealing and transporting a dead body, separately proscribed under the separate charge of concealment. *See id.* The General Assembly created the crime of concealment in 2007, 12 years after passage of the defilement statute. *See* 2007 Va. Acts ch. 436 (creating crime of concealment); 1995 Va. Acts ch. 306 (creating crime of defilement). If "defile" had the broad meaning ascribed to it by the majority here, the General Assembly would have had no need to pass the concealment statute, which is much narrower, proscribing more precise acts toward the body and requiring "malicious intent." *See* Code § 18.2-323.02. It is true that the same actions may in some cases constitute more than one crime. *See, e.g.*, Code § 18.2-32 (defining first- and second-degree murder); Code § 18.2-53.1 (defining use or display of a firearm in the commission of enumerated felonies, including murder). Yet, by broadening the definition of defilement to include every act of concealment, the majority interprets the defilement statute "in a manner that . . . ascribe[s] to the General Assembly a futile gesture." *Shaw v. Commonwealth*, 9 Va. App. 331, 334 (1990).

"It is 'our duty to interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal.'" *Va. Electric & Power Co. v. State Corp. Comm'n*, 300 Va. 153, 161 (2021) (quoting *REVI, LLC v. Chicago Title Ins. Co.*, 290 Va. 203, 208 (2015)). Accordingly, I would hold that defilement requires something more than the actions Diaz took here.[11] Because I believe that the evidence was insufficient as a matter of law to find Diaz guilty of defilement and that the trial court erred in denying her motion to strike that charge, I respectfully dissent from that portion of the majority opinion.

---

[11] Similarly, the majority's holding opens the door to permit prosecutors to charge defilement in any murder case in which a defendant took any physical actions toward the body after the murder occurred. I do not believe the legislature intended such a result.